**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **DR. RED WASHBURN,** ) | |
| ) | **No.** |
| **Plaintiff** ) | |
| **v.** ) | |
| ) | **COMPLAINT and** |
| **KINGSBOROUGH COMMUNITY COLLEGE,** ) | **JURY DEMAND** |
| **DR. JOANNE RUSSELL, DR. EILEEN** ) | |
| **FERRETTI, MICKIE DRISCOLL, DR.** ) | |
| **MICHAEL BARNHART , JAMES CAPOZZI,** ) | |
| **DELISE CHUNG, ROXANNA THOMAS,** ) | |
| **AND THE CITY UNIVERSITY OF** ) | |
| **NEW YORK,** ) | |
| ) | |
| **Defendants.** ) | |

## I.      PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.
   §2000e et seq. ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. §1981a, the
   Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, et seq. ("ADA"), the
   Civil Rights Act of 1871, 42 U.S.C. §1983, the U.S. Constitution, and the New York State
   Human Rights Law, N.Y. Exec. Law §290, et seq. ("NYHRL"), and the New York City
   Administrative Code §8-101 et seq. ("NYCAC"), based on sex, sex stereotyping, gender
   expression, gender identity, disability, and retaliation, including hostile work environment, and
   retaliatory hostile work environment.

## II.      PARTIES

2. Plaintiff Dr. Red Washburn is a citizen of the United States and a resident of Kings
   County, New York.  Plaintiff is an Associate Professor of English and Director of
   Women's and Gender Studies ("WGS") at Defendant Kingsborough Community
   College.

3. Dr. Washburn is a genderqueer, nonbinary, and gender non-conforming transgender person, who uses the singular pronouns "they" and "them" to refer to themselves.

4. The singular pronouns "they" and "them" are used in this Complaint to refer to Dr. Washburn. References to "they" and "them" in regard to Dr. Washburn refers to Dr. Washburn alone, unless otherwise stated.

5. Defendant Kingsborough Community College ("Kingsborough") is a corporation organized and existing under the law of the State of New York with its principal place of business at 2001 Oriental Boulevard, Brooklyn, New York 11235.

6. At all times relevant herein, Defendant Kingsborough has continuously employed more than five hundred (500) employees.

7. At all times relevant herein, Defendant Kingsborough has continuously been an employer engaged in an industry affecting commerce within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§2000e(b), (g), and (h).

8. At all times relevant herein, Defendant Kingsborough has continuously been an employer as that term is defined in N.Y. Exec. Law §292.5 and NYCAC §8-102(5).

9. Defendant Kingsborough is a recipient of federal funds.

10. The following Defendants ("Individual Defendants") were employees of Defendant Kingsborough:

   a. At all relevant times, Dr. Joanne Russell has been the Provost of Kingsborough;

   b. At all relevant times, Dr. Eileen Ferretti has been the Chair of the English Department;

   c. At all relevant times, Ms. Mickie Driscoll has been the Executive Director of Human Resources and Labor Designee;

d.   At all relevant times, Dr. Michael Barnhart has been the Chair of the History Department;

e.   James Capozzi was the Director of Public Safety at all relevant times until December 13, 2019;

f.   At all relevant times, Delise Chung has been an employee of Kingsborough in the Public Safety Department.

11. Defendant The City University of New York ("CUNY") is a corporation organized and existing under the law of the State of New York, including but not limited to New York Education Law § 6201, et seq., with its principal place of business at 205 East 42nd Street, New York, NY 10017.

12. Defendant CUNY is a recipient of federal funds.

13. Kingsborough is part of the CUNY system.

14. CUNY and its Board of Trustees supervise, manage and administer Kingsborough and its academic programs and requirements.

### III.   PROCEDURAL HISTORY

15. On or about November 21, 2018, Dr. Washburn filed a complaint with the New York Commission on Human Rights, which complaint was cross-filed with the Equal Employment Opportunity Commission ("EEOC" or "Commission").

16. The complaint alleged violations of 42 U.S.C. § 2000, et seq. ("Title VII"), the Americans With Disabilities Act, as amended, ("ADA"), the NYSHRL, and the NYCAC, including discrimination because of gender, including sex, sex stereotyping, gender expression, gender identity, as well as disability, including gender dysphoria, and physical limitations due to gender-confirming surgery, and other physical and mental impairments (the "Protected Categories"). The complaint also alleged hostile work environment because of the Protected Categories, retaliation for protected activities, and retaliatory hostile work environment.

17. On or about October 24, 2019, Dr. Washburn filed a First Amended Verified Complaint with the New York City Commission on Human Rights, and this complaint was cross-filed with the EEOC.

18. On November 15, 2019, Plaintiff withdrew their complaint from the New York Commission on Human Rights.

19. On November 15, 2019, Plaintiff requested that the EEOC issue a dismissal and notice of right to sue.

20. Plaintiff took all necessary steps to exhaust their administrative remedies.

21. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## IV.    JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act, the Americans with Disabilities Act, and 42 U.S.C. §1983, and pursuant to 28 U.S.C. § 1337 because the action is based on a federal statute regulating commerce.

23. This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy as the federal claims.

24. This Court has subject matter jurisdiction over the NYC law claims pursuant to 28 U.S.C. § 1367 because the NYC law claims form part of the same case or controversy as the federal claims.

25. Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the unlawful employment practices is alleged to have been committed within the United States District Court for the Eastern District of New York.

26. Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed within the United States District Court for the Eastern District of New York.

27. A substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District at Brooklyn.

## V.    FACTS

28. For the past ten years, Plaintiff Dr. Red Washburn has identified as a genderqueer, nonbinary, and gender non-conforming person.

29. Dr. Washburn also secondarily will sometimes use the adjective "transgender" when explaining their gender to others, as it is a more commonly understood term.

30. Dr. Washburn uses the pronouns 'they,' 'their' and 'them,' and such references are used herein to refer to Dr. Washburn. Outside of work, they go by "Red," under which they publish their creative writing as well.

31. Within the past two years, Dr. Washburn has also identified as transgender.

32. Dr. Washburn is the co-Director of the Women and Gender Studies Concentration of the Liberal Arts degree program.

33. Much of the discrimination and retaliation directed against Dr. Washburn has taken the form of attempts to destroy the WGS concentration in order to reduce Dr. Washburn's role at the College and to force them to resign by creating disrespectful conditions intolerable to any reasonable faculty member and scholar.

34. This complaint sets forth in detail the many events at Kingsborough that might otherwise seem to be neutral responses to academic needs, and unrelated to gender and retaliation, so as to connect them to the discriminatory and retaliatory schemes in which the Defendants participated, and to demonstrate that the so-called "legitimate and non-discriminatory" reasons

5

for the Defendants' odd behavior are nothing more than a pretext for discrimination and retaliation.

## A. Sex, Gender, Gender Expression, and Gender Identity

35. *Sex* is a term that includes gender, gender expression, and gender identity within its meaning.

36. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's gender expression or identity.

37. *Gender* refers to cultural expectations specific to the sexes.

38. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

39. *Gender identity* refers to a person's internal sense of sex, being male, female, both or neither.

40. Gender identity is intractably rooted at a very early age and cannot be changed.

41. *Transgender individuals* are people who have a gender identity that does not match the sex they were assigned at birth.

42. *Gender non-conforming* refers to a person whose gender expression and/or gender identity does not conform to social expectations.

43. *Genderqueer* and *nonbinary* are terms referring to combinations of gender identities and expressions, such as combinations of being masculine and feminine, or neither or both. It encompasses both gender fluid and fixed gender persons.

44. *Gender transition*. Transgender individuals often seek out legal, social, and medical means of aligning external manifestations of their sex and gender with their gender identity. This process is colloquially known as *gender transition* or *transition*.

45. Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, gender expression, gender identity, or gender transition.

### B. Gender Dysphoria

46. *Gender dysphoria* is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress with the sex they were assigned at birth.

47. Gender dysphoria is found in the *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* of the American Psychiatric Association.

48. Based on many scientific studies during the past two decades, gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system.

49. Scientific studies have shown that transgender persons have brain structures that are typical of non-transgender people with the same gender identity. For example, transgender women (i.e., individuals whose sex assigned at birth is male but who have female gender identity) have brain structures that are similar to those of non-transgender women.

50. Discrimination against transgender people diagnosed with gender dysphoria is based on disability.

51. Dr. Washburn experienced discrimination based others' perception of them as being disabled because of gender dysphoria.

52. It is appropriate to refer to a transgender non-binary gender non-conforming person with non-binary pronouns (e.g., them, they, theirs).

### C. Employment With Kingsborough

53. Plaintiff Dr. Red Washburn has been a member of the faculty at Kingsborough Community College since 2011.  Dr. Washburn was awarded tenure by Defendant

Kingsborough in the Fall of 2017.  Throughout their employment with Kingsborough, Dr. Washburn has consistently received awards, grants, and positive performance reviews.

1. **Gender Transition In Fall 2017**

54. After receiving tenure in Fall 2017, Dr. Washburn started a process of changing their name from "Amy" to "Red," and pronouns from "she/her/hers" to "they/them/theirs" at work.

55. This process included informing colleagues of these changes and that they are transgender.

56. Dr. Washburn changed their email signature and office door to reflect this name change.

57. In late Spring 2018 and early Summer 2018, Dr. Washburn asked to have their email changed with Information Technology, and their workloads with the English Department filed under "Red."

58. In addition, Dr. Washburn advised colleagues that they intended to have 'top surgery' – a gender confirming medical procedure – in Summer 2018.

59. The surgery occasioned a disability, specifically a physical and psychological impairment of the musculoskeletal system, the immunological systems and the skin, which is still ongoing.

60. On September 24, 2018, Dr. Washburn requested reasonable accommodations associated with their top surgery.

61. These accommodations included

    a.  modification of duties, including limitation of duties to teaching and research, but not personal attendance at meetings until November 1, 2018, to assist in performing the essential functions of the position by allowing Dr. Washburn to heal from surgery, to reduce mental and physical stress, and to retain enough energy to perform classroom and research duties;

      b.  limitation of duties to lifting nothing over five pounds in weight, and nothing requiring raising hands above shoulder height until February 1, 2019, to assist in performing the essential functions of the position by allowing Dr. Washburn to continue to teach and to do research without causing injury to shoulders and chest.

62. These accommodations were granted on September 28, 2019.

63. In early Fall 2018, Dr. Washburn completed forms to change their gender with Defendant's Human Resources.

### 2.  Dr. Washburn's Experience of Discrimination

64. Since Dr. Washburn has come out as transgender at work, they have experienced ongoing discrimination, including harassment and hostile work environment, in their terms, conditions and privileges of employment, because of their gender.

65. They have been misgendered continually (purposely incorrectly gendered by others).

66. The discrimination has not only affected them as an individual, but also the Women's and Gender Studies Concentration ("WGS"), of which they are the Director.

67. WGS has been affected by sudden changes to its program that belie explanations by the Individual Defendants regarding ostensibly neutral principles that have required shrinking of support for WGS leading to concerns about its viability.

68. WGS  is a legally recognized 'concentration,' which means students, regardless of major, may take a certain number of courses listed with WGS. If satisfactorily passed, the student receives a designation on their transcript and degree stating that they passed the Women's and Gender Studies concentration.

69. A concentration is generally considered less than a 'minor,' which is a more extensive course of study. It nonetheless requires legal recognition by the Defendant Kingsborough, for which extensive documentation of the need and interest is required.

70. WGS courses have long serviced hundreds of students each year, and many students have elected to take the WGS concentration. Directing this concentration requires extensive effort, for no additional monetary compensation, and is so demanding that it historically required co-Directors, rather than a single Director.

71. WGS is also cherished by faculty and students because the study of gender and gender discrimination has increasingly been recognized over the past 50 years as a subject worthy of study as its own discipline, and important to our society because of the systematic oppression of persons based on their gender, which warps society in ways now generally considered harmful.

72. This increasing recognition of the importance of gender studies makes it all the more incongruous that Dr. Washburn has been forced to file this complaint regarding their endurance of repeated incidents of discrimination, harassment, retaliation and hostile work environment because of their gender.

73. Dr. Washburn found these incidents and the environment thereby created to be unduly burdensome and unreasonably interfering with their work

74. Dr. Washburn found these incidents and the environment thereby created to be offensive, and which any reasonable person would consider offensive.

75. Individual incidents, viewed in isolation, could be explained as non-discriminatory. However, when viewed properly in combination with and in the context of the gender-based animus towards Dr. Washburn that began shortly after they came out, the workplace environment is revealed as one that is rife with hostility against Dr. Washburn based on

their gender, and which greatly affected Dr. Washburn's terms and conditions of employment and their ability to perform their work.

76. Dr. Washburn's attempts to work at Kingsborough and to run their WGS concentration have been blocked and thwarted at every turn based on gendered animus.

77. Since coming out as transgender, Dr. Washburn has experienced discrimination and retaliation from Kingsborough Community College and the Individual Defendants, without any legitimate academic reason, in their work at Hunter College, in grants formerly permitted, in cutting long-standing WGS administrative staff, unusual interference in Middle States Reviews and Annual Program Reviews, in the surprising scheduling of classes, in unwarranted curricular interference, in being the subject of public safety investigations, in the investigation and disciplining of students openly supportive of WGS, in incidents at the College Counsel, in threats of retaliation by lawsuits against Dr. Washburn for raising discrimination complaints.

78. Requests for reasonable accommodations have been denied without interactive process and reasonable cooperative dialogue.

79. The additional emotional and physical stress placed upon Dr. Washburn during a period of healing from gender-confirming surgery caused difficulty in healing and were responsible, in whole or in part, for need for additional surgical revisions and additional healing time.

80. The WGS concentration has been affected by relocation to a tiny room, F331, that cannot support the hundreds of students and courses requiring WGS support.

81. Dr. Washburn has also been required to engage in extensive efforts to prepare, file and prosecute discrimination complaints that have detracted from their ability to conduct the work of the school and have increased their level of stress at a time when they are recuperating from top surgery, which has impeded their physical healing.

82. Furthermore, Defendants Kingsborough and CUNY have created and enforced policies resulting in misgendering (being purposely gendered incorrectly by others) of Dr. Washburn.

83. These defendants printed and circulated forms and applications which express limitations and specifications as to gender, specifically being the forms titled "Gender Change Forms."

84. These forms list specifically limited denomination of gender that are mutually overlapping, but of which only one may be chosen, requiring Dr. Washburn and others to incorrectly document their gender in order to be recognized by the system.

85. Defendants also continually engaged in misgendering Dr. Washburn, despite clear notice of Dr. Washburn's proper name, title and gendered pronouns.

86. This misgendering continued unapologetically to a degree that denotes intentional misgendering, rather than innocent mistakes made by persons unfamiliar with issues of gender.

87. These actions were because of the Protected Categories or with the Protected Categories as a motivating factor.


   **3. Discrimination in Teaching at Hunter College**

88. Dr. Washburn has taught in the English Department at Hunter College since fall 2010.

89. Dr. Washburn began teaching in the English Department at Kingsborough Community College in the Fall of 2011.

90. Dr. Washburn taught Multi-Ethnic American Literature, Introduction to Women's and Gender Studies, Classics in Feminist Thought, Queer Theory, Prison, Gender, and Human

Rights, and Writings from Detention, the first of which was in the English Department and the latter of which was cross listed with the English Department.

91. Dr. Washburn was permitted by English Chair Eileen Ferretti at Kingsborough to continue teaching at Hunter College as 'overload.'

92. "Overload" refers to teaching a course, in addition to a faculty member's regularly required load of courses, and for extra compensation.  "Inload" refers to teaching a course that is part of a faculty member's regularly required load of courses.

93. In the Fall of 2015, Dr. Washburn was permitted to teach two courses at Hunter College in the English and Women's and Gender Studies Departments.  One of these courses was designated inload, and the other was designated overload.

94. This arrangement was approved by English Chair Dr. Eileen Ferretti at Kingsborough, English Chair Dr. Sarah Chinn at Hunter, Women's and Gender Studies Chair Dr. Catherine Raissiguier at Hunter, Provost Stuart Suss and Provost Rick Fox at Kingsborough, and Provost Leon Kaufman at Hunter.

95. As part of this arrangement, Dr. Washburn taught one Hunter course as part of their inload coursework at Kingsborough. This arrangement was designed to allow them to conduct interdisciplinary work in Women's and Gender Studies at Hunter that would inform their work at Kingsborough and their own required research as a scholar. Research scholarship is one of three categories of work in which Dr. Washburn, as a faculty member, is contractually required to engage. The other two categories are teaching and service.

96. In addition, given that Dr. Washburn was about to become the new Director of Women's and Gender Studies at Kingsborough for the Spring 2016 semester, the agreement between Hunter and Kingsborough was intended to build Women's and Gender Studies connections for Kingsborough and to bolster the program with a cross-campus intellectual work.

97. Provost Joanne Russell approved this arrangement in the spring of 2016, when she began her term as Provost.

98. As the new Director of Women's and Gender Studies, Dr. Washburn invited Provost Russell to the Women's and Gender Studies "Across the Disciplines Faculty Roundtable" for Women's History Month on March 29, 2016, where Dr. Washburn first met Provost Russell in person.

99. Their relations seemed to be cordial and collegial.

100.   However, upon their meeting for the first time, at the Roundtable, Dr. Russell appeared surprised at and uncomfortable with Dr. Washburn's appearance as a visibly gender-nonconforming person.

101.   Dr. Washburn noted Dr. Russell's reaction of surprise and discomfort with their gender-non-conforming appearance, as it was palpable and undisguised.

102.   Dr. Washburn, having previously experienced situations in which transphobic people reacted with surprise and discomfort with to their gender non-conforming appearance, knew from these experiences that Dr. Russell had a transphobic reaction to their gender non-conforming appearance.

103.   Dr. Washburn nonetheless attempted to cordially engage Dr. Russell in conversation about gender issues on campus and the role of Women's and Gender Studies in campus life, but Dr. Russell appeared to have some discomfort with discussions of gender non-conformity.

104.   After and, upon information and belief, because of meeting Dr. Washburn as a visibly gender-nonconforming person, Provost Russell did not approve Dr. Washburn's teaching arrangement with Hunter College for the Fall 2016. Such disapproval was very unusual. It

was in contrast to her prior approval, and not justified by the academic facts and circumstances of the situation.

105.   On April 16, 2016 and then again on May 2, 2016, Provost Russell notified Provost Leon Kaufman at Hunter that Dr. Washburn's teaching at Hunter, i.e, one class as overload and one class as part of their inload at Kingsborough was not approved.

106.   Dr. Washburn filled out appropriate paperwork to account for this departure from their arrangement.

107.   However, in the fall 2016 and spring 2017 semesters, Dr. Washburn did not receive money they were owed by Hunter, because personnel at Hunter were not aware of these unusual changes by Kingsborough.

108.   Margaret Belizaire in Human Resources at Kingsborough caught this error in the mid-fall 2016 semester, reported it to Jemima Francois in Human Resources at Hunter, and it resulted in tax problems for Dr. Washburn that year.

109.   Since the Fall 2017, Dr. Washburn dropped down to teaching one class in Women's and Gender Studies at Hunter, as an overload to Dr. Washburn's regular load at Kingsborough.

110.   This was problematic for Dr. Washburn, as it required teaching 4 classes in a semester, rather than the usual 3 classes, and travel to another campus.

111.   This was also problematic for WGS because it impinged on Dr. Washburn's ability to perform the extensive administrative and advisory work that WGS required.

112.   Despite the approval of two provosts and three chairs, and her own prior consent, Provost Russell refused to approve  teaching at Hunter in Women's and Gender Studies as part of Dr. Washburn's inload.

113.   This disapproval was explained as the prerogative of Provost Russell, but no specific academic reason was given, although it was requested by Dr. Washburn, to justify this unusual disapproval.

114.   To their knowledge, Dr. Washburn has been at all relevant times the only transgender faculty member at Kingsborough.

115.   To their knowledge, Dr. Washburn has been at all relevant times the only faculty member who is not allowed to teach at another CUNY campus as part of their Kingsborough inload.

116.   Dr. Russell's reversal of their prior approval happened close in time to Dr. Washburn's gender transition and the first meeting between Dr. Washburn and Dr. Russell, in which Dr. Russell expressed palpable discomfort with their gendered appearance.

117.   As a result of the events described above, and Dr. Washburn's continued interaction with Provost Russell, it became clear to Dr. Washburn at that time that Provost Russell was acting from animus against Dr. Washburn and the program of which they were Director because of the Protected Categories or with the Protected Categories as a motivating factor.

118.   A series of adverse actions then ensued against Dr. Washburn, and the WGS program of which they were Director, instigated by Provost Russell.

119.   These actions were unusual and not justified by the academic facts and circumstances of the situation.

120.   These actions were because of the Protected Categories or with the Protected Categories as a motivating factor.

121.   Although Provost Russell and the other Defendants attempted to justify these actions by adverting to academic requirements as their legitimate, non-discriminatory reasons, these explanations were pretexts for discrimination.


   4.  **Discrimination in CUNY and Kingsborough Grants**

122.   Dr. Washburn has received PSC-CUNY Women's and Gender Studies Grants and Kingsborough Faculty Innovation Grants every year since they started at Kingsborough. In total, they have received eight PSC-CUNY Women's and Gender Studies Grants and three Faculty Innovation Awards.

123.   In 2016-2017, however, Provost Russell rejected Dr. Washburn for the Faculty Innovation Award. This was the only rejection they received.

124.   In addition, at the suggestion of English Chair Dr. Eileen Ferretti, Dr. Washburn applied for a Coordinating Undergraduate Education Project ("CUE") for Women's and Gender Studies, which offers monies to campus programs for student success.

125.   Dr. Washburn sent an email inquiry, and on October 23, 2016, Provost Russell specifically discouraged them from submitting an application.

126.   Dr. Washburn applied and they were formally rejected in Spring 2017.

127.   After these two rejections, and the hostile work environment to which they were being subjected, Dr. Washburn neither applied for a Faculty Innovation Award, nor a CUE grant in 2017-2018, as doing so would obviously be futile.

128.   The lack of a Faculty Innovation Award affected Dr. Washburn as an individual, but, more significantly, the lack of a CUE grant negatively affected the WGS concentration Dr. Washburn directs.

129.   At Provost Russell's suggestion, despite the lack of funding, Dr. Washburn took on meeting with Dean Sharon Warren Cook, Dean of Curriculum, Instruction, And Assessment, and commencing work on a WGS major, articulation agreements, and learning outcomes in the early spring 2017, in addition to their other teaching and research commitments.

130.   They continued these discussions in the early fall 2017, but because their WGS Co-
director Professor Alison Better was on parental leave in the fall 2017, they did not
complete and submit this work with the WGS faculty until the early spring 2018.

131.   Dr. Washburn did all the required work, which was more than the work required for any
other concentration, and provided the necessary materials to Provost Russell.

132.   Provost Russell, however, refused not only to give them a budget, but also she removed
all existing resources from WGS, discussed in more depth below.

133.   These events were because of and motivated by the Protected Categories.


   5.   **Discrimination Affecting Women's and Gender Studies Administrative Staff**

134.   Like all other Liberal Arts ("LA") concentrations, WGS had an office assistant, Ms.
Nettie Wiener, since its creation as a concentration in 1994. Ms. Wiener was the
administrative assistant for almost two decades.

135.   On August 30, 2017, while Dr. Washburn was on annual leave, Provost Russell emailed
Dr. Washburn to ask about Ms. Wiener's responsibilities.

136.   When classes resumed, Dr. Washburn met with Provost in early fall 2017.  Provost
Russell said she could not continue to support WGS having an administrative assistant.

137.   Dr. Washburn provided her with a comprehensive document outlining all of Ms.
Wiener's duties, and Provost Russell said she would hold off because "she sounded like
'Superwoman.'" This referred to Ms. Wiener's superior ability to handle the many
responsibilities required to properly administer WGS.

138.   During this meeting, Provost Russell kept calling Dr. Washburn "Amy," even after Dr.
Washburn provided a note regarding appropriate use of name based on gender identity to
Provost Russell, Professor Ferretti, and Dean Cook.

139.   Nonetheless, for no apparent reason, Provost Russell relocated Ms. Wiener to Liberal Arts, a move which made Ms. Wiener's work more difficult because of the lack of disability access to Liberal Arts. Provost Russell was aware of this.

140.   As a result of this decision by Provost Russell, Ms. Wiener, a 92-year-old woman with mobility issues was forced into retirement in the summer 2018.

141.   WGS was not permitted to hire or receive assistance from administrative personnel.

142.   The lack of an administrative assistant made the job of co-Chair more onerous, causing great difficulty to Dr. Washburn.

143.   These events were because of the Protected Categories.


### 6.   Bias-Motivated Interference in Liberal Arts Middle State Review and Annual Program Review for WGS

144.   In or about Fall 2017, Provost Russell contacted WGS co-Director Caterina Pierre, and advised her that she would no longer receive "reassigned" time, which refers to time reassigned from teaching duties to important service duties, such as directing programs.

145.   Providing reassigned time to Professor Pierre was a temporary arrangement intended to allow Professor Pierre to finish out her term as Co-Director of WGS as she mentored two new Co-Directors, Professor Better and Professor Washburn.

146.   Professor Better was on parental leave in Fall 2017, which left Dr. Washburn as sole WGS Director with no mentorship that semester and an enormous workload.

147.   Dr. Washburn submitted the Annual Program Review for WGS to Professor Greenberg, the Director of Liberal Arts ("LA"), in Fall 2017.

148.   As a result of Provost Russell's actions, Dr. Washburn was required to complete the review alone, a time-intensive task.

149.   The Annual Program Review is a comprehensive review of the program that requires coordinating the responses of many faculty members, obtaining a large amount of data, and processing hundreds or thousands of documents.

150.   Provost Russell was aware Dr. Washburn just completed the SUNY Suffolk Community College Review of WGS, for which Dr. Washburn was paid as an outside reviewer, scholar, and director in WGS, which Dr. Washburn discussed in the meeting and noted in their correspondence to the entire campus community in their College Council nomination.

151.   Thus, Provost Russell was aware of the importance and size of the task of program review.

152.   Shortly thereafter, Provost Russell cancelled the Middle States 7-year review of Liberal Arts.

153.   Provost Russell stated that the reason for this cancellation was that LA was "not ready."

154.   There was no objective evidence that LA was unready.

155.   This action by Provost Russell also meant WGS received no review.

156.   These events adversely affected Dr. Washburn and WGS.

157. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor.


   **7.   Bias-Motivated Interference in Schedule of Classes and WGS**

158.   Dr. Washburn, as the co-Director of WGS, routinely compiled and distributed WGS class offerings to teachers and students who might be interested, in order to ensure that the classes were as full as possible.

159.   Course with low enrollment are more costly to the college, as the cost per student increases with a larger number of faculty needed to teach many low enrollment courses, rather than fewer faculty for fewer high enrollment courses.

160.   In Fall 2017, Dr. Washburn inquired about the English offerings that would be cross-listed as WGS courses.

161.   "Cross-listing" refers to courses listed as existing in a department that could also fulfill requirements in another department or program.

162.   Dr. Washburn was told to limit offerings with cross-listing to ensure that each WGS cross-listed program obtain a greater number of students, rather than spreading potential enrollment across many classes, causing lower enrollment.

163.   After WGS faculty discussion and recommendations, Dr. Washburn recommended the cross-listed courses to be cut, including a cross-listing associated with Instructor Joanna Stein, who was not involved with the WGS faculty community at that time.

164.   Chair Ferretti, however, surprisingly disregarded the WGS program decisions, stating that any faculty member who wanted to teach WGS was entitled to do so, causing great concern among WGS faculty and Director Washburn that lower enrollments would result, imperiling the WGS program.

165.   Dr. Washburn wrote to Chair Ferretti directly, stating the college's customary practice that WGS directors forwarded names to chairs for approval, which are routinely approved because the tradition has been to respect the knowledge of the program directors and faculty in making such decisions.

166.   On November 17, 2017, Provost Russell intervened in the process, ruling that Instructor Stein could teach the course. Her reasoning, which is unrelated to any prior customary

practice of WGS, was that it was a "themed" course, not a WGS required course, and therefore its cross-listing did not have to be approved by WGS.

167.   This decision negated the autonomy of WGS in determining what would meet the needs of the programs.

168.   Such autonomy is ordinarily taken as a matter of course, as the expertise of the faculty members in a program is considered important to decision making about how to administer a successful and academically rigorous program.

169.   Provost Russell's decision imperiled the enrollment of WGS courses.

170.   Dr. Washburn, at Provost Russell's insistence, met with Dean Cook in late fall of 2017 to discuss their concerns in regard to cross listing courses for WGS designated faculty, and they devised appropriate qualifications together with WGS faculty.

171.   Provost Russell, however, completely ignored Director Washburn's list of qualifications created with Dean Cook. Instead, Provost Russell has continued to state that WGS classes are "themed" classes any faculty member can teach. Not only does this attenuate the rigorous approach required for WGS as a field of scholarly study, it was had the intent and effect of undermining Dr. Washburn's role as a director with the ability to make decisions related to their field of expertise.

172.   Chair Ferretti has refused all meeting requests with Dr. Washburn, save for two short unrelated meetings. She explained this based on her busy schedule, health, and family issues, yet she was meeting with other faculty and directors.

173. These events were because of or motivated by the Protected Categories, or with the Protected Categories as a motivating factor.

### 8.   Bias-Motivated Unwillingness to Use Gender-Neutral Name

174.   During the correspondence regarding this and other matters, despite Dr. Washburn continuing to inform colleagues they went by "Red" as a part of their gender transition, and signing all correspondence "Red," staff continued to refer to Dr. Washburn by the incorrect female name.

175.   While occasional misgendering could be attributed to innocent error, the protracted and continuing misgendering of Dr. Washburn, despite continued notice, created a hostile environment based on gender.

176.   Another change in treatment of Dr. Washburn involved a change from addressing them on a collegial first name basis, as was the custom of most other faculty, particularly within departments, to using their last name only.

177.   For example, on November 16, 2017, Chair Ferretti wrote to Dr. Washburn, addressing them formally as "Professor Washburn." Until Dr. Washburn requested the use of the name "Red" as part of their gender transition, Chair Ferretti had used Dr. Washburn's first name in a more collegial fashion.

178.   The change in form of address demonstrates discomfort with Dr. Washburn's use of a gender-neutral first name as part of their gender transition.

179.   Provost Russell, who up until this point used Dr. Washburn's first name, also now referred to them as "Professor Washburn." This change in form of address demonstrates discomfort with Dr. Washburn's use of a gender-neutral first name as part of their gender transition.

180.   On May 14, 2019, Dr. Washburn asked Chair Ferretti to be allowed to make some announcements about WGS at an English Department meeting. Chair Ferretti deadnamed Dr. Washburn, calling them by their former, incorrectly gendered name. Chair Ferretti did not just once, but twice publicly. Only after colleagues in the English Department expressed upset did Chair Ferretti use the correct name.

181.  Unfortunately, Chair Ferretti continued to use Dr. Washburn's incorrectly gendered prior name on many occasions to the present.

182.  History Chair Dr. Michael Barnhart has also repeatedly referred to Dr. Washburn by an incorrectly gendered former name publicly, and laughed at their name in front of many colleagues in the History Department.

183. In July 2019, Dr. Washburn again requested that Ms. Driscoll update payroll to reflect accurately Dr. Washburn's name as they were having issues with their bank and taxes because of the defendant's refusal to make the changes.

184. In August 2019, Dr. Washburn again requested that IT update their name on Blackboard and the CUNY Portal.

185. To date, Blackboard has been updated, but the CUNY portal still has Dr. Washburn's incorrectly gendered former name.

186. Although Dr. Washburn had requested in November 2017 that their name be changed in email, course catalogs, HR, payroll, Public Safety ID, and other university publications and documents, Defendants, including Defendant Mickie Driscoll, at first refused to make the changes, then demanded documentation and then more documentation.

187. When the requested documentation was provided, Defendants then chose to change only certain systems and not others.

188. The changes made to CUNYFirst, directory name, and email finally occurred in the summer of 2019 after Dr. Washburn published an op-ed with *The Daily News* calling out the College for failing to do so.

189. As of October 2019, almost two years after the initial requests, Defendants are still dragging their feet and have not completed all the name changes that Dr. Washburn requested.

190. In Defendants' answer to the Verified Complaint filed by Dr. Washburn with the New York City Commission on Human Rights, Defendants also repeatedly misgendered Dr. Washburn.

191. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor.

### 9. Threats of Retaliation Against Dr. Washburn

192. On November 22, 2017, Chair Ferretti wrote to Dr. Washburn, copying Provost Russell and Dean Cook, threatening Dr. Washburn with a spurious defamation action for stating their concerns about discrimination and retaliation:

> Let me be very clear that I will take legal action against you if you attempt to defame my character by suggesting that my right as a chairperson to retain the integrity of a writing program under the auspices of the English Department is in any way, shape, or form, an attack on the rights of the LGBTQ community or any individual member of that group. Let the record of all transactions between us be professional, completely transparent, and free from this type of innuendo. It is a fact that the person you attempted to bar from teaching a WGS section of English 24 is a member of the LGBTQ community; is in a same sex marriage; and has a child with her partner. However, this fact is subordinate to the reality that WGS includes women of all sexual preferences and gender orientations/identities.

193. Chair Ferretti's threats to Dr. Washburn because of Dr. Washburn's expressed concerns about discrimination constituted retaliation, as well as action because of the Protected Categories or motivated by the Protected Categories.

194. This overreaction by Chair Ferretti came immediately before a decision was due to be announced regarding Dr. Washburn, and it caused reasonable concern that Dr. Washburn's tenure decision was being threatened because of retaliation, as well as because of the Protected Categories or motivated by the Protected Categories.

195.   The response also inappropriately stated the difference between gender identity and sexual orientation, included misgendering Dr. Washburn in name, incorrectly identifying Dr. Washburn as a "woman," and conflating gender identity and sexual orientation.

196.   This response, coming from Chair Ferretti, an English professor who was tasked with supervising a Women's and Gender Studies program, demonstrates a fairly extensive lack of knowledge of contemporary gender studies and its scholarly concerns, as well as biases about the Protected Categories at issue in the poor treatment by Chair Ferretti of Dr. Washburn and their concerns of discrimination.

197. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor, as well as retaliation for prior protected activities.


**10. <u>Discrimination in English Teaching Schedule and Reasonable Accommodations</u>**

198. As a full-time faculty member, Dr. Washburn customarily filled out their teaching preferences almost one year before classes start.

199. On September 7, 2018, just one business day before the semester started, Provost Russell canceled Dr. Washburn's Sexuality and Literature class.

200. Dr. Washburn had created this class in 2013, and they had taught it every fall since then.

201. This cancellation was explained as due to low enrollment.

202. This explanation was incorrect, as the amount of enrollment was the same as that considered sufficient for other classes.

203. The real reason was discriminatory and retaliatory in nature.

204. Dr. Washburn had previously submitted a request for reasonable accommodation because of their gender-confirming top surgery, granted by the school, of which Chair Ferretti was aware.

205. The reasonable accommodation included lessening Dr. Washburn's responsibilities because of the stresses involved in recovering from surgery.

206. Chair Ferretti notified Dr. Washburn via email of the cancellation that Friday morning before a long holiday weekend.

207. As a result, Dr. Washburn was to be assigned to take on a different class to fill their workload requirements.

208. This change required Dr. Washburn to immediately create a new syllabus, a time-consuming process involving a multi-page document with assignments, class lessons, additional student materials, and classroom administrative requirements.

209. Dr. Washburn was caught by this cancellation while traveling to a conference out of town, and they had very low energy after only a month post-surgery.

210. Dr. Washburn notified Chair Ferretti of these concerns.

211. In response, Chair Ferretti, calling Dr. Washburn by the inappropriate former name, rearranged Dr. Washburn's schedule.

212. The new schedule gave Dr. Washburn a schedule that put them on campus from 10AM to 5PM for just two classes.

213. While Chair Ferretti is permitted to create such a schedule for appropriate academic needs, this schedule was not explained by any academic needs, and was done with the intent and effect of creating an adverse employment action and hostile environment for Dr. Washburn based on the Protected Categories and retaliation, because Chair Ferretti knew that Dr. Washburn was recuperating from surgery and required a schedule that accommodated that recuperative period.

214. Dr. Washburn told Chair Ferretti that the schedule was not possible, given their health concerns and their need to rest and recuperate, as noted in the reasonable accommodations

request of which Chair Ferretti was aware. Dr. Washburn asked for an online class as an alternative.

215. Later that day, Chair Ferretti told Dr. Washburn a faculty member "graciously" gave them his overload class, implying that this was an act of grace for Dr. Washburn's defalcation, rather than due to Chair Ferretti's attempts to subject Dr. Washburn to a hostile work environment.

216. This schedule change, misgendering, and advocacy work was extremely stressful to them during this recovery time at the beginning of the semester.

217. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor, and retaliation for prior protected activities.

### 11. <u>Discrimination in the Women and Gender Studies Concentration</u>

218. Provost Russell directed Dr. Washburn to work on a proposal to turn the WGS concentration into a major.

219. Such a proposal is lengthy and time-intensive, requires gathering extensive data, and obtaining buy-in from many college stakeholders.

220. In early spring 2018, after working with Dean Cook and Professor Better, Dr. Washburn completed the extensive paperwork for a full-degree program in WGS, with a WGS major under Liberal Arts. This effort involved consultation with the Director of Liberal Arts, Professor Cindy Greenberg, and approximately 20 core and 40 affiliated WGS faculty across the disciplines.

221. Shortly thereafter, in the spring 2018, Provost Russell met with the Liberal Arts ("LA") Director and Advisory Board. She provided options for the LA concentrations, including dissolving the concentration, offering "themed" courses, helping them to develop articulation agreements as they had none, and becoming a major.

222. Months later, Provost Russell finally met with Professors Better and Washburn and several others to discuss the WGS LA Concentration.

223. Dr. Washburn shared the extensive documentation for the proposal with Provost Russell.

224. Provost Russell was aware that WGS, unlike LA, had more than a half a dozen articulation agreements, and were working on new ones with new programs, including with Brooklyn College.

225. Provost Russell was aware that the WGS proposal for a full degree program was modeled on the English major proposal at Kingsborough, WGS major proposal at BMCC, and the WGS minor and major proposal for a department at Hunter.

226. Provost Russell was aware that extensive work had been put into the WGS proposal by many faculty for almost a year, including Dean Cook.

227. Startingly, Provost Russell declared she would not look at their lengthy major proposal, claiming falsely that WGS was "not ready."

228. Dr. Washburn later learned that Provost Russell had adopted this judgment from the Director of the Behavioral Sciences and Human Services Department, Chair Michael Miranda, where Provost Russell later proposed to send the WGS concentration. Chair Miranda has no background in WGS.

229. Provost Russell falsely stated that WGS had no articulation agreements.

230. When Dr. Washburn then produced copies of several such agreements, Provost Russell changed her reason for denial, stating falsely that the agreements were not honored at the senior colleges.

231. Provost Russell's statement was not true, for other directors of WGS programs honor them, including Hunter College.

232. Provost Russell then refused to look further at the WGS major proposal and stated she would not meet with the WGS faculty.

233. Provost Russell thereafter took the radical step of ordering that WGS would no longer be an independent interdisciplinary concentration housed within the Liberal Arts degree, but would be housed in the Behavioral Sciences and Human Services Department.

234. This move was in violation of College and CUNY bylaws, because WGS is an 'interdisciplinary' program that involves coursework from many areas.

235. Interdisciplinary programs are protected from being housed in a disciplinary Department, because the demands of disciplinary fields are well-known to subordinate programs under them to their own disciplinary needs.

236. Women's and Gender Studies is not behavioral science, and it is not social work or other human service work.

237. It includes ways of seeing and knowing the world that are different from traditional disciplines.

238. It uses various types of study, including but not limited to social science, history, humanities, literary criticism, and popular culture,  to explore core concepts such as the social construction of gender, privilege and oppression, intersectionality (the differential effects of multiple marginalized social statuses), and feminist praxis (various practices such as mutual nurturance, emotional maturity, communality, nonviolence and small groups working for change).

239. The Behavioral Sciences and Human Services Department, by contrast, includes courses of study such as "Chemical Dependency Counseling, A.S.," "Early Childhood Education/Child Care, A.S.," "Education Studies, A.S.," "Mental Health and Human Services, A.S.," "Alcoholism and Substance Abuse Counseling Certificate."

240. Placing WGS within a disciplinary unit, in this case the Behavioral Sciences and Human Services Department, inevitably leads to coursework largely based on behavioral science and human services courses alien to the interdisciplinary nature of the program.

241. The move would also result in WGS being housed outside of the director's department of Liberal Arts, outside of the department where most of WGS faculty were, and where founding director, Dr. Inez Martinez, taught.

242. This move was made at the direction of Provost Russell without the usual formal process required by Kingsborough procedures to move the interdisciplinary WGS program into a traditional department.

243. Provost Russell also took away the 'reassigned time' previously accorded to Professor Better and Professor Washburn that allowed them to take the time necessary to administer the program.

244. This action violated established practice for directors of a concentration and increased the workload of both Professors, while still obligating them to continue all the many time-consuming administrative functions of running WGS, unless they stepped down, which she suggested they do.

245. This move by Provost Russell had the intent and effect of undermining Dr. Washburn's role as director.

246. Provost Russell wrote to Professor Better and Dr. Washburn and asked them to stay on as directors without reassigned time, although she acknowledged that their work would be significantly "diminished" without institutional support.

247. Provost Russell never responded to Dr. Washburn's follow-up discussion request.

248. Provost Russell took these actions because of the Protected Categories, or with the Protected Categories as a motivating factor.

249. Provost Russell's explanations of her actions for allegedly legitimate and non-discriminatory academic reasons were false, and were a pretext for discrimination because of the Protected Categories, or with the Protected Categories as a motivating factor.

### 12. <u>A Discriminatory and Retaliatory Public Safety Investigation</u>

250. At the end of the spring 2018, just after the WGS meeting with Provost Russell in which she cut WGS resources, WGS faculty met to discuss the future of WGS.

251. WGS faculty had a number of ideas, and students had ideas as well. A campaign in favor of the Women's and Gender Studies Concentration began.

252. Students involved with the WGS and the WGS Club wrote letters to Provost Russell, urging her to provide institutional support in the areas of co-director reassigned time, administrative staff, and allowing WGS to become a full degree program with an interdisciplinary base, and opposing discrimination based on the Protected Categories.

253. Students also posted flyers around campus about resource cuts to many programs on campus, in an attempt to alert the campus community, including students, faculty, staff and administrators, to the problematic nature of the treatment of the course of study about gender offered by the Women's and Gender Studies Concentration based on the Protected Categories.

254. Provost Russell retaliated against WGS faculty and students because of this campaign and their opposition to discrimination based on the Protected Categories.

255. Provost Russell, upon information and belief, instigated, suggested, and/or encouraged a number of serious and adverse actions against WGS faculty and, in an attempt to intimidate and retaliate against them, against their students with whom they had a close student-teacher bond because of WGS and the Protected Categories or motivated by the Protected Categories as a factor.

256. WGS students published an article in the campus newspaper supporting Dr. Washburn's WGS Concentration, discussing WGS resource cuts, and opposing discrimination based on the Protected Categories.

257. Provost Russell retaliated for this by cutting the funding for the newspaper, resulting in significantly fewer issues of the paper.

258. Levy Moore, who oversaw the graduating student Izzy Rivera who wrote the piece, was relocated to the Men's Center in retaliation.

259. Brian Mitra, the Dean of Student Affairs, now reviews issues of the campus newspaper as a prior restraint before allowing publication also in retaliation.

260.  Defendant James Capozzi, Director of Public Safety, summoned students, most of whom were queer women of color, to interrogate them about the campaign regarding WGS, including the flyers that had been posted.

261. These actions were based on animus against the course of study about gender offered by the WGS and animus against Dr. Washburn as a gender- non-conforming faculty member, by Defendants Russell and Capozzi.

262. These actions were also based on retaliation for Dr. Washburn's complaints of discrimination against the course of study about gender offered by the WGS and against Dr. Washburn as a gender- non-conforming faculty member, by Defendants Russell and Capozzi.

263. Tania Rodriguez, was an award-winning student, the recipient of the WGS Award, the President of the WGS Club, and one of two students at Kingsborough accepted into the prestigious Exploring Transfer Program at Vassar College.

264.  In her interrogation, Ms. Rodriguez was threatened with expulsion by Public Safety officers, told she would not graduate, would not be able to transfer to Columbia University (where Ms. Rodriguez is studying now), and that they would send her to the head of Public Safety "who used to be in the FBI," unless she named names of students engaged in the WGS campaign.

265. Ms. Rodriguez did not provide names to Public Safety despite these threats because to do so would be to participate in a discriminatory and retaliatory adverse action.

266. In retaliation, on July 26, 2018, Dean Cook, in retaliation for her opposition to discrimination based on the Protected Categories, removed the previously-granted 'waiver' that Ms. Rodriguez needed in order to receive her WGS degree, resulting in her receiving only a Liberal Arts degree, and not a WGS degree.

267. This act was in retaliation for Ms. Rodriguez's failure to cooperate with the discriminatory and retaliatory campaign against Dr. Washburn and their WGS program.

268. Upon information and belief, this act was instigated, suggested and/or encouraged by Provost Russell and other Defendants.

269. Other students and faculty were called into Public Safety as a part of this investigation into the WGS campaign, but Dr. Washburn was targeted with the most intensity.

270. In Summer 2018, James Capozzi and Delise Chung of Kingsborough Public Safety initiated contact with Dr. Washburn while they were on annual leave, a time where they are not required to be on campus or engage in academic correspondence.

271. At that time, Dr. Washburn was at Vassar College on a Visiting Professorship and not in the local area from beginning of June until the end of July.

272. Specialist Delise Chung of Public Safety contacted Dr. Washburn on July 7, 2018, addressing and misgendering them twice as "Ms. Washburn." She said Public Safety received a complaint involving their name and to contact her about scheduling a time for an investigation.

273. Dr. Washburn responded and advised Specialist Chung that they were on annual leave and would subsequently, be on sick leave because they were having top surgery; therefore,

a postponement was necessary. Dr. Washburn also asked for information about the

complaint, if it came with disciplinary action, and if they could bring legal representation.

274. On August 7, 2018, a week after their top surgery, Dr. Washburn provided Public Safety

with a medical note from their doctor's nurse practitioner, Ms. Whitney Saia, who wrote

on behalf of their surgeon, Dr. Alexes Hazen:

> Red Washburn was seen in their office on August 7, 2018 following a
> medically necessary surgical procedure on July 31, 2018. For the next three
> months, they should only engage in teaching and research responsibilities and
> not engage in additional professional meetings or responsibilities in order to
> ensure a full recovery and lower stress. It is my medical opinion that they
> may return to full duty work on November 1, 2018.

275. Dr. Washburn copied Chair Ferretti on this email to alert her of their need for reasonable

accommodations. While Chair Ferretti kindly responded that she "hopes all goes well with

the surgery," she still continued to misgender Dr. Washburn, calling them "Amy."

276. On August 23, 2018, in contravention to the arrangements previously made by Dr.

Washburn to meet with Public Safety after return to full duty work, Mr. Capozzi sent Dr.

Washburn an email and a certified letter, requiring that they come to Public Safety in

connection with an investigation as soon as possible.

277. Mr. Capozzi revealed that the investigation was connected to the campus campaign for

WGS.

278. Mr. Capozzi was aware that Dr. Washburn was recovering from surgery, had received the

previously mentioned medical letter, and that the meeting needed to be scheduled for a

time after Dr. Washburn's return to full duty work based on disability accommodations.

279. In his communication, Mr. Capozzi also misgendered Dr. Washburn, calling them "Ms.

Washburn" and "Amy" in the letter, although he was aware this was inappropriate.

280. Dr. Washburn was on bed rest and quite weak, and called Renee Lasher, the Director of

Contract Administration at the PSC-CUNY union, to intervene on their behalf.

281. On August 27, 2018, Ms. Lasher wrote to Mr. Capozzi, stating:

> Mr. Capozzi, I am the Director of Contract Administration at the PSC, and I am providing representation for Professor Washburn in this matter. As you have been made aware, Professor Washburn is currently recovering from surgery. The attached letter is surprising because there has been prior email correspondence throughout the annual leave period and during Professor Washburn's recovery regarding this meeting. The meeting was scheduled for mid-September, and then Professor Washburn informed the college that due to their medical condition, for which documentation was provided, they would need to postpone the meeting. The attached letter doesn't reflect any of that history, so please inform me as to the college's position on the scheduling of this investigative meeting. Please communicate with me directly.

282. Defendant Capozzi did not respond for three weeks, which caused significant psychological distress to Dr. Washburn while recovering from surgery, because of their reasonable and justified concern about retaliation against WGS faculty and students.

283. Three weeks later, on September 17, 2018, Mr. Capozzi wrote that he would await Dr. Washburn's return, continuing to misgender them by using "she/her/hers" pronouns, although he was aware this was inappropriate.

284. Since the above-referenced September 2018 communication, Dr. Washburn has heard nothing further from Public Safety about this investigation.

285. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor, and retaliation by Defendants Russell, Chung and Capozzi.

### 13. Discrimination and Retaliation in Removal of Campus Accommodations

286. Two days after the start of the Fall 2018 semester, on September 14, 2018, Provost Russell emailed Professors Better and Washburn. She advised that she had decided to remove the WGS office from its long-standing place on campus, including Dr. Washburn.

287. This direction was part of a larger reorganization of campus space that occurs from time to time.

36

288. Most of the reorganization was based on neutral principles unrelated to the Protected Categories.

289. However, this reorganization also provided a perfect pretext for Provost Russell to discriminate and retaliate against Dr. Washburn by relocating the WGS program from its spacious office to a tiny closet far away on the large 71-acre Kingsborough campus, as demonstrated by the different treatment described below.

290. The WGS office has been the center of the intellectual community for WGS faculty and students for 25 years.

291. It included Dr. Washburn's office.

292. The office has an important history, meaningful to the Kingsborough College community, as it was dedicated to WGS by the English Department as a gift to its admired first directors, Professors Inez Martinez and Fran Kraljic.

293. The removal of WGS from its space on campus caused great disruption to WGS faculty and students, including Dr. Washburn as its co-Director.

294. The intent and effect of the relocation by Provost Russell was to retaliate against Dr. Washburn for complaining of discrimination, and constituted an adverse action because of retaliation.

295. At the beginning of the Fall 2018 semester, Provost Russell directed that Dr. Washburn and Dr. Better remove hundreds of files, books, student projects, and personal faculty belongings by October 1, 2018.

296. This direction was particularly surprising and concerning because it came at the beginning of the semester, known to Provost Russell to be an especially busy time for faculty, and involved a large volume of essential WGS and faculty materials located there, with less than three weeks notice, and while Dr. Washburn was recovering from surgery and receiving accommodations for disability.

297. This direction forced Dr. Washburn to engage in additional remedial activities to address this surprising and concerning direction, including coordinating an effort to make arrangements their doctor and the union to intervene.

298. This put additional psychological stress on Dr. Washburn.

299. Provost Russell was aware that Dr. Washburn was recuperating from surgery and receiving accommodations for disability.

300. Provost Russell was also aware and, upon information and belief, intended that this create additional psychological stress for Dr. Washburn.

301. Provost Russell's direction was all the more surprising and unusual given that it came at a time when there was a surfeit of office space, and office space was being provided to other programs.

302. This excess of office space was a great boon to many programs that could now receive office space that would allow them to provide additional services to students.

303. It also meant that there was no academic need to relocate the WGS office and Dr. Washburn.

304. For example, Journalism and Creative Writing, which had no offices, were given office space.

305. This was done despite the fact that Creative Writing would generally not be considered for office space because it is not a concentration legally recognized by the College.

306. However, upon information and belief, Provost Russell favored these programs because of gender, in that they are directed by heterosexual cisgender (i.e., non-transgender) men.

307. The directors of Journalism and Creative Writing also received "reassigned time," referring to releases to allow them to teach fewer courses and spend that time on their programs.

308. Again, Creative Writing is not a concentration legally recognized by the College. It is unusual for the director of such a non-recognized program to received reassigned time.

309. Upon information and belief, WGS is the only program or concentration that lost an office entirely, and all other directors have offices with their concentrations.

310. As an illustration of Dr. Washburn's different treatment, their co-Director, Professor Better, has received a private office, as is usual for a tenured Associate Professor and Co-Director of WGS.

311. By contrast, Provost Russell directed Professor Washburn to use a small shared office currently assigned to a non-tenured Instructor.

312. This arrangement made it very difficult for Dr. Washburn to meet with WGS students, as there was not enough room to put another chair to allow a student to sit.

313. In order to properly perform the duties of a director of WGS, Dr. Washburn needed continual access to the hundreds of files and books currently stored in the large WGS area. The files contain student documentation, previous class materials and schedules, and other essential information.

314. On September 17, 2018, Professor Better wrote to Provost Russell to request a postponement of the office move until the winter session, given the challenges of moving during the semester for WGS faculty and for them with physical limitations, in particular.

315. Within minutes, Provost Russell responded that anything purchased with college funds ("tax levy") should stay, personal belongings should be removed, and the new occupants were moving in early October.

316. On September 18, 2018, Dr. Washburn's surgeon, Dr. Alexes Hazen reiterated Dr. Washburn's restrictions:

> Until November 1, 2018, Prof. Washburn requires limited work responsibilities in order to heal from top surgery. They must not work for long periods of time. In their case, they require a light teaching schedule, or one that is compacted so that

> they are not at work for long stretches. They must limit their professional
> activities to teaching and research, as preparation for and attendance at meetings
> can be onerous for such patients. This would include additional duties like
> committee work and other meetings. They must not lift more than 20lbs. they
> advise their double incision patients to avoid over the shoulder arms positions and
> excessive arm motioning like sorting and filing for up to six months. Red falls
> under this category. Until February 1, 2019, Red must avoid high boards and
> shelves and abide by instructions regarding reaching and lifting. For example,
> they should avoid activities that will result in excessive and high stress, such
> as moving materials from one office to another. These accommodations are
> essential for both physical and psychological health during their transition."

317. On September 20, 2018, Provost Russell emailed Professor Better and Professor Washburn

that she, Dean Cook, and VP Rios entered the WGS office without notice, and she was giving

them an extension until October 15, 2018, given the large number of books in the office.

318. Shockingly, she told them to "donate" the books to the Women's Center and the Behavioral

Sciences and Human Services Department.

319. This suggestion was inappropriate because it meant that students and faculty of WGS would no

longer have practical access to the books central to their field of scholarship and study.

320. Furthermore, "for safety and to help with the transition," she said she was asking Buildings

and Grounds to put a lock on the door, that Professor Better, Professor Washburn, and other

WGS faculty had to contact Dean Cook to enter the office, and that she was sending boxes to

start packing their belongings.

321. Professor Better responded on September 21, 2018 to request the WGS files remain in the

office and mentioned that she and Professor Washburn would need access to the office with

their own keys.

322. Professor Washburn also responded with a request to access the office with their own key as it

was their only office, that they use it frequently for their duties, and that they will make sure the

security is not compromised in any way.

323. On September 24, 2018, Dr. Washburn filed a report with Public Safety because there was

broken artwork on the floor of the office when they entered.

324. No response was ever received from Public Safety because, upon information and belief, they were retaliating against Dr. Washburn at the suggestion of Provost Russell, who informed Public Safety that Dr. Washburn was persona non grata.

325. On September 24, Provost Russell advised that she would allow Dr. Washburn to use their own key, but the files must be removed.

326. She told them they were returning to the office they formerly had an an Assistant Professor, F-331, which Provost Russel knew could not house all these materials that they need to do their job properly.

327. Dr. Washburn's attorney requested additional accommodations for Dr. Washburn that would permit them to retain the office, as the former office was practically inaccessible due to disability.

328. On October 11, 2018, Ms. Julie Block-Rosen, Legal Counsel and Labor Designee of Kingsborough, responded that they could have an extension until October 30, 2018, and to call Buildings and Grounds to make arrangements.

329. However, she said that they could not postpone the move until February 1, 2019, in accordance with Dr. Washburn's medical restrictions.

330. Dr. Washburn asked Chair Ferretti and Provost Russell for an office of appropriate size and advised them that the treatment being accorded to Dr. Washburn and WGS appeared to be unequal and motivated by bias and retaliation.

331. They asked to meet with Professor Ferretti on October 19, 2018.

332. Professor Ferretti refused. She said she was busy with meetings, was not feeling well, and would let them know when she had availability.

333. Chair Ferretti never scheduled the meeting.

334. On October 24, 2018, Chair Ferretti advised Dr. Washburn that because WGS was not part of the English Department, they would have to return to their former office, F-331, and there was no response to the request for a room to store the extensive WGS materials.

335. Chair Ferretti noted that the provost and vice president approve office requests, and that her hands were tied.

336. This is belied by the fact that she made requests for other directors to receive new offices at the same time.

337. For example, these included lecturers Instructor Brian Katz and Instructor Patrick Hickey.

338. On October 30, 2018, Dr. Washburn wrote to Provost Russell and VP Rios asking for their own office or a shared director office.

339. Provost Russell responded by re-sending the previous denial emails, along with Chair Ferretti's email.

340. On October 30, 2018, Professor Cindy Greenberg, associated with WGS, wrote to Provost Russell, VP Rios and Professor Better, asking (again) for permission to use F314, the former Liberal Arts office, asking if the Liberal Arts Directors, including WGS, could move in there. She cited the 2004 Annual Program Review recommendations for a bigger office.

341. Dr. Washburn reiterated a request for this move, proposed effective February 1, 2019.

342. Provost Russell never responded to these requests.

343. These events regarding campus accommodations were because of the Protected Categories, or with the Protected Categories as a motivating factor, and because of retaliation for prior protected activities.

### 14. <u>Discrimination Against WGS at the Highest Levels of Kingsborough</u>

344. On October 29, 2018, Professor Better and Professor Washburn, along with a number of faculty and staff attended the President Claudia Schrader's "Meet and Greet."

345. This was the first time Dr. Washburn met the new president.

346. Dr. Washburn was called upon to speak, and publicly commended President Schrader on her diversity statement to the college and asked her how she might support WGS.

347. President Schrader said she appreciated receiving all the letters from across the nation that supported WGS.

348. She said, however, that the information shared was inaccurate, that they should speak to Provost Russell, not her, and implied that Dr. Washburn was monopolizing the conversation. In fact, Dr. Washburn did not speak any longer than any other speaker.

349. It was quite clear to Dr. Washburn and other listeners that President Schrader implied that WGS had no support in the administration.

350. On March 21, 2019, President Schrader made a keynote address in honor of Women's History Month.

351. At the end of the presentation, when asked about her support of WGS, President Schrader falsely stated that WGS had not submitted the paperwork to become an offered degree.

### 15. <u>Discrimination in Gender Recognition at the College and CUNY Level</u>

352. Dr. Washburn began requesting that their name and gender be changed on Kingsborough records in Summer 2018.

353. They requested the name on their email be changed to "Red" by email with Asif Hussain in Information Technology, most recently on July 7, 2018.

354. Mr. Hussain told them he could not change it, and that it had to be changed in "CUNY First."

355. Dr. Washburn sought information on how to change their name and gender in the CUNY First system, but the information was very difficult to find.

356. They were finally directed to certain forms mandated by CUNY and called the "gender change" form.

357. Dr. Washburn identified themselves on the form, using the choices provided by Kingsborough and CUNY, as transgender, nonbinary, and gender non-conforming.

358. On or about November 1, 2018, Mickie Driscoll, Director of Human Resources for Kingsborough, advised Dr. Washburn that their gender selections on Kingsborough and CUNY's gender change form were invalid and stated that the form could not be processed under Kingsborough and CUNY's system of gender recognition.

359. Ms. Driscoll refused the change.

360. She stated that the CUNY system only allowed one gender designation.

361. Dr. Washburn had chosen three gender descriptions, because each is disparate and discrete and yet their gender cannot be described accurately using only one descriptor.

362. These descriptors are *transgender*, *nonbinary*, and *gender non-conforming*.

363. On November 16, 2018, Dr. Washburn's attorney advised Ms. Driscoll as follows:

> The definition of "transgender" in the New York City Human Rights Law very clearly states that a transgender person may identify as non-binary and gender non-conforming.
>
> *Transgender*: an adjective used to describe someone whose gender identity or expression is not typically associated with the sex assigned at birth. It can be used to describe people with a broad range of identity or expression. Someone who identifies their gender as androgynous, gender queer, non-binary, gender non-conforming, MTF (male to female), or FTM (female to male) may also consider themselves to be transgender.
>
> Thus a person identifying as non-binary and gender non-conforming may also identify as transgender. The law also defines "gender non-conforming."
>
> *Gender Non-Conforming*: an adjective sometimes used to describe someone whose gender expression differs from traditional gender-based stereotypes. Not all gender

44

non-conforming people are transgender. Conversely, not all transgender people are gender non-conforming.

Thus, 'transgender' and 'gender non-conforming' are not synonymous, and a person may identify as both.

Under the New York City Human Rights Law, Dr. Washburn is entitled to have their gender identity respected as they identify, not as determined by an employer. As an employer, Kingsborough Community College must use an individual's preferred name, pronoun and title. See https://www1.nyc.gov/site/cchr/law/legal-guidances-gender-identity-expression.page#3.1

While I understand that there is or may be an administrative system which requires the choice of only one of these, administrative convenience is not a justification for misidentifying an employee's gender.

On behalf of Dr. Washburn, I request that your system conform to the law's requirement of identifying their gender, rather than their gender being conformed to the requirements of your administrative system.

364. These forms and responses caused much distress to Dr. Washburn while they were on

sick leave.

365. Ms. Driscoll continued to refuse the change and referred the matter to CUNY.

366. There was no response from CUNY to Ms. Driscoll's inquiry.

367. Kingsborough and CUNY still have not input Dr. Washburn's gender request into the

CUNY First system.

368. These events were because of the Protected Categories, or with the Protected Categories as a

motivating factor.


16. **Public Concerns Raised by Dr. Washburn Regarding Women's Rights and Transgender Rights at Kingsborough and CUNY and Retaliation Because of Their Expression of These Public Concerns**

369. Beginning in and about Fall 2018, Dr. Washburn informed other women and gender

studies scholars about the events at Kingsborough.

370. Dr. Washburn was not required to do so as part of their duties as a Professor at

Kingsborough.

371. Dr. Washburn spoke to those persons as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the rights of women and transgender persons and in regard to the studies of women's and gender rights.

372. These subjects and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

373. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring.

374.   These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

375. By contrast, the issues being raised by Dr. Washburn invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

376. The public nature of the concerns being raised by Dr. Washburn surrounding WGS is demonstrated by the fact that people around the nation spoke up in response to Dr. Washburn's expression of public concerns about WGS and the deterioration of support for women's rights and transgender rights at the nation's colleges, including Kingsborough.

377. President Schrader received many letters beginning in and around Fall 2018 raising concerns about the need to support studies of women and gender as a matter of public and political concern.

378. These letters came from Kingsborough students, including WGS alums studying at Columbia University, Vassar College, City College, the CUNY BA for Interdisciplinary Studies, and the Grad Center. CUNY Faculty also sent letters, including Kingsborough WGS faculty, and CUNY WGS directors on other campuses.

379. Faculty from across the nation also noted their support of Dr. Washburn's efforts for WGS, including faculty from Rutgers University, Purdue University, and University of Nevada, among many others.

380. These included letters from the most highly-regarded scholars in the field, including Judith Butler, Joan Scott, and Mary Hawkesworth. National Women's Studies Association President Primilla Nadasen also wrote a letter to support WGS.

381. These letters were in support of the public concerns regarding Kingsborough and CUNY's treatment of studies pertaining to women's rights and transgender rights.

382. After these events, Chair Ferretti, with upon information and belief the approval, condonation and/or ratification of Provost Russell, removed Dr. Washburn from the Strategic Planning Committee in or about May 2019.

383. Chair Ferretti did so because of the expressions by Dr. Washburn, detailed above, protected by the First Amendment of the United States Constitution and the New York State Constitution, Article I, § 8.

384. Dr. Washburn was replaced with a white cisgender heterosexual male who was not on the College Council, which Council membership is a requirement for serving on the Strategic Planning Committee.

385. Dr. Washburn was told that their removal and replacement was "for diversity," meaning that it was because of the Protected Categories.

386. In fact, this explanation was a pretext for the real reason, which was in retaliation for Dr. Washburn's activities protected by the First Amendment of the United States Constitution and the New York State Constitution, Article I, § 8.

387. Dr. Washburn also gave testimony at the Sexual Harassment in the Workplace Public Hearing at the New York State Senate on May 24, 2019, the subject of which was the institutional transphobia experienced by students and faculty at Kingsborough.

388. Dr. Washburn was not required to do so as part of their duties as a Professor at Kingsborough.

389. Dr. Washburn spoke to those persons as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the rights of women and transgender persons and in regard to the studies of women's and gender rights.

390. These subjects and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

391. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring.

392. These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

393. By contrast, the issues being raised by Dr. Washburn invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

394. The public nature of the concerns being raised by Dr. Washburn surrounding WGS is demonstrated by the fact that their testimony was given at a public hearing called by the New York City Council.

395. On June 13, 2019, Dr. Washburn published an op-ed in *The Daily News*, "Transgender and Ostracized on Campus," discussing institutional transphobia at Kingsborough and the hostile environment for LGBTQ individuals.

396. Dr. Washburn was not required to do so as part of their duties as a Professor at Kingsborough.

397. Dr. Washburn published the op-ed as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the rights of women and transgender persons and in regard to the studies of women's and gender rights.

398. These subjects and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

399. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring, though Dr. Washburn also discussed their personal concerns.

400. These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

401. By contrast, the issues being raised by Dr. Washburn invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

402. The public nature of the concerns being raised by Dr. Washburn surrounding WGS is demonstrated by the fact that a mass market public newspaper published Dr. Washburn's words as an opinion editorial.

403. With Dr. Washburn's assistance and encouragement, CUNY's Center for LGBTQ Studies sent a petition in support of LGBTQ students, faculty and studies at Kingsborough on June 13, 2019.

404. Dr. Washburn was not required to do so as part of their duties as a Professor at Kingsborough.

405. Dr. Washburn spoke to CUNY's Center for LGBTQ Studies as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the

rights of women and transgender persons and in regard to the studies of women's and gender rights.

406. These subjects of the petition and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

407. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring.

408.  These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

409. By contrast, the issues being raised by Dr. Washburn invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

410. The public nature of the concerns being raised by Dr. Washburn through this petition is demonstrated by the fact that 1,056 members of the public signed the petition.

411. With Dr. Washburn's assistance and encouragement, New York City Council Member Helen Rosenthal, Chair of the Committee on Women and Gender Equity, and Council Member Inez Barron, Chair of Higher Education Committee sent a letter to Kingsborough on June 20, 2019 in support of LGBTQ students, faculty and studies at Kingsborough.

412. Dr. Washburn was not required to assist the Council Members to compose and send the letter as part of their duties as a Professor at Kingsborough.

413. Dr. Washburn spoke to those Council members as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the rights of women and transgender persons and in regard to the studies of women's and gender rights.

414. These subjects and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

415. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring.

416.  These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

417. By contrast, the issues being raised by Dr. Washburn invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

418. The public nature of the concerns being raised by Dr. Washburn surrounding WGS is demonstrated by the fact that these letter emanated from public officials of New York City regarding the subject matter of support for women's rights and gender rights at Kingsborough and CUNY.

419. On October 30, 2019, a "Trans CUNY Town Hall" was sponsored by the Center for LGBTQ Studies and the Center for the Study of Women in Society at the CUNY Graduate Center.

420. It was the first ever town hall about trans issues in CUNY, and it was standing room only with Council member Helen Rosenthal and Ndigo Washington as speakers.

421. Dr. Red Washburn and Dr. Paisley Currah, Endowed Chair of Women's and Gender Studies at Brooklyn College, facilitated this discussion.

422. As a result of the town hall, on November 27, 2019, Dr. Washburn testified, along with faculty and students, at an oversight hearing of the Committee for Women and Gender Equity of the New York City Council on the subject of Gender Equity in NYC: Access, Resources, and Support for Transgender and Gender Non-Conforming New Yorkers.

423. Dr. Washburn was not required to do so as part of their duties as a Professor at Kingsborough.

424. Dr. Washburn spoke to the CUNY Town Hall and the NYC Council Committee oversight hearing as a citizen on a matter of public concern regarding perceived discrimination and official misconduct in regard to the rights of women and transgender persons and in regard to the studies of women's and gender rights.

425. These subjects and the audience to which they were addressed had a broader public purpose and were matters of political, social and other concern to the community.

426. These subjects raised issues separate and apart from any personal concerns that Dr. Washburn had about the discrimination and retaliation they were personally enduring.

427.   These were matters of public concern that raised issues separate and apart from Dr. Washburn's duties as co-Director WGS, which were limited to running the program using the resources provided by Kingsborough.

428. By contrast, the issues being raised by Dr. Washburn at the CUNY Town Hall and the NYC Council Committee oversight hearing invoked public and political concerns about the deterioration of support for women's rights generally, and the social understandings and misunderstandings surrounding transgender persons and their rights.

429. The public nature of the concerns being raised by Dr. Washburn surrounding WGS is demonstrated by the fact that these were large public events specifically on this subject matter, and the NYC Council Committee oversight hearing was called by a public body of the City of New York.

430. The events detailed above in this section of the Complaint were expression protected by the First Amendment to the United States Constitution and the New York State Constitution, Article I, § 8.

431.  It would be clear to a reasonable person in the position of the Defendants that their conduct in retaliating against Dr. Washburn for these expressions was unlawful.

432.   On December 6, 2019, Dr. Barnhart cancelled Dr. Washburn's Introduction to Women's and Gender Studies class for the winter.

433.   Upon information and belief, this was with the approval, condonation and/or ratification of Chair Ferretti and Provost Russell

434.   Course cancellations usually happen a few days or a week before classes.

435.   Dr. Barnhart cut this class approximately three weeks before the deadline period he shared last year, a very unusual timing, as students have not yet all had time to register for the class.

436.   Students typically register for winter classes after the fall semester ends for a number of reasons, mainly to focus on their current studies and to see what classes they pass or fail.

437.   The class is a required class for WGS students, so its cancellation had severe consequences for WGS and WGS students.

438.   There were 10 students in the class, which seats 30.

439.   Upon information and belief, the enrollment cut-off for other classes was 9 or below.

440.   In other years, Dr. Washburn has taught classes with this enrollment or just above.

441.   Every time Dr. Washburn has taught this class, it ran with only a few seats left. Dr. Barnhart said the class had to run with 90-95% enrollment this time.

442.   Dr. Washburn's class was the only class in History cancelled this early.

443. As a result of Dr. Washburn's activities of public concern protected by the First Amendment to the United States Constitution and the New York State Constitution, Article I, § 8, unrelated to their personal complaints and role as Director of WGS, the Defendants retaliated against Dr. Washburn.

17. **Provost Russell's Attempts To Decrease Enrollment to WGS and to Change Its Mission By Moving It Into An Unrelated Department And Eliminate the Co-Director Role**

444. In response to the public support of the concerns raised by Dr. Washburn in regard to women's rights and transgender rights, and the importance of their public study, and in contrast to her former refusal to meet with Dr. Washburn, Provost Russell met with Dr. Washburn and Professor Better on November 12, 2018.  Provost Russell also invited Behavioral Sciences and Human Services Department Chair Miranda to attend, along with Dean Cook.

445. Dr. Washburn requested that Professor Greenberg, the Director of the Liberal Arts degree program, Emma Powell, the Contract Coordinator at the PSC- CUNY Union, Professor Libby Garland of History, and Professor Lesley Border be invited to attend the meeting to speak about curricular concerns with the major proposal and the possibility of creating a Department of Liberal Arts or Department of Interdisciplinary Studies to support the study of women's rights and transgender rights.

446. Dr. Washburn provided an additional agenda to be considered with other items on it, including administrative issues with forms and institutional support, particularly reassigned time, administrative staff, and an office.

447. Provost Russell disallowed the other colleagues from attending and only added "new forms" and "interdisciplinary foundation" to the agenda.

448. This is significant because it meant those with an interest in and understanding of the relationship of WGS to Liberal Arts would be excluded, allowing Provost Russell more easily and with less resistance to effectuate her scheme to discriminate and retaliate against Dr. Washburn and WGS.

449. Before the meeting, Dr. Washburn received an email from Chair Ferretti to refill out their workload for the winter in History through English. The email was forwarded from

Provost Russell. This was never expected of Dr. Washburn, and it was a form of intimidation before the meeting.

450. At the meeting, the first day back after sick leave for Dr. Washburn, Provost Russell focused the majority of the meeting on the Introduction to Women's and Gender Studies course, currently in History, designated HIS 66. It was housed there because of the former Co- Director of WGS, LA Director, and History Chair Fran Kraljic sat there, though cross-listed as WS 10.

451. Provost Russell erroneously stated that WGS did not have an Intro to WGS course.

452. WGS does, in fact, have History 66: Introduction to WGS (formerly Women in the Social Sciences).

453. Provost Russell also said that WGS could not become a program until there was an Intro to WGS class.

454. She said the new class would be under the Behavioral Sciences and Human Services Department ("BEH").

455. Provost Russell instructed Professor Washburn to send their syllabus for the course they have taught for more than 15 years at several institutions, most recently at Hunter, to Professor Better and Professor Miranda for them to create and offer to faculty in Behavioral.

456. Provost Russell stated that she would not give WGS any resources until WGS had this new course and she saw growth.

457. Provost Russell incorrectly said WGS must go in BEH because WGS was created in BEH and WGS was now under BEH.

458. Professor Washburn respectfully disagreed with Provost Russell and stated that WGS was created in English and History, has been under Liberal Arts since 1994 and operates

across all the disciplines, has a WGS advisory Board, which WGS still honors, and this structure was voted on at College Council.

459. Professor Washburn asked Provost Russell if she went through the proper channels to move WGS into BEH.

460. Normally, moving a concentration would require approval from the Curriculum Committee, the College Council, the Board of Trustees, and the State.

461. Provost Russell responded that Liberal Arts not a department, so therefore no such channels were needed, and that it was under BEH, a department.

462. Professor Washburn told Provost Russell that they were concerned that Russell was undermining their role as a director by sending the WGS major they created to BEH, where it had been rejected by Professor Michael Miranda because it was "not ready;" despite clear evidence to the contrary.

463. Dr. Washburn noted that Provost Russell had recently asked them to send their syllabus to BEH to create an Intro to WGS class for only BEH faculty to teach, an alarming sign for the interdisciplinary nature of WGS.

464. Dr. Washburn further noted that Provost Russell ignored the fact that WGS was an interdisciplinary field in art, speech, biology, health, math, etc., and WGS already had the intro course.

465. Dr. Washburn also requested that the History Department should be advised to refrain from cancelling the class prematurely, and that it should be designated "WGS" and cross listed with every department, as many other CUNY colleges do, because students do not know that "Intro to WGS" is in the History course catalog. Otherwise, WGS courses and WGS itself would lose enrollment and be in danger of being closed for low enrollment. Provost Russell indicated that she was unimpressed by any of these concerns.

466. Dr. Washburn told Provost Russell that, so as to allow students to graduate with a WGS concentration, they had met with History Chair Michael Barnhart to discuss teaching WGS-required classes in the winter and spring, with the permission to do so as overload by English Chair Eileen Ferretti. This was necessitated by the fact that Provost Russell had, surprisingly, taken away the power to waive requirements from Professor Greenberg, Director of Liberal Arts, and no longer allowing substitutions as a temporary fix.

467. Provost Russell said she would not allow WGS to have its own course, reiterating that it was now in BEH, without cross-listings.

468. The lack of cross-listings means the courses would be difficult for students to find, thus lowering the enrollment of WGS, and making it more vulnerable to reduction or elimination.

469. Provost Russell's reasoning for this was that cross-listing is "difficult for learning outcomes" and she "does not advise it."

470. This makes no academic sense, because, to the extent that a course might have additional learning outcomes due to cross-listing with another program, that can easily be accommodated, and there is no research literature to suggest that cross-listing courses is inadvisable.

471. WGS courses are cross-listed at many other CUNY colleges, including Hunter and Brooklyn, the latter of which is the most established WGS Program in CUNY.

472. Despite sending Professor Better and Professor Washburn an email before the meeting with instructions for a proposal to become a full degree program, which proposal had already been prepared, Provost Russell abruptly said WGS was "not ready," even though it is the most established concentration at Kingsborough.

473. Provost Russell said WGS enrollment was too low, though the evidence showed it had recently experienced a 50% increase (despite serious administration-created issues, such as inability to search on CUNY First, and HIS 66 being cancelled prematurely).

474. Provost Russell also noted as justification, in a rambling address that is difficult to follow, that WGS had resources through Counseling, the Men's Center, and the Women's Center (although these are extracurricular, not academic resources); and that WGS had to prepare a justification for a full-degree program to get more resources (which, as previously noted, had been prepared by Professors Better and Washburn, but which Provost Russell refused to review), and that WGS was still in the Liberal Arts degree even though it would not be supervised by the Chair of the Department of Behavioral Sciences and Human Services.

475. Provost Russell, upon being requested to meet with WGS faculty to discuss these significant curricular issues, said that first Professors Better and Washburn would need to create an Introduction to WGS class.

476. WGS already had an Introduction to WGS class, so this demand made little sense.

477. Dr. Washburn followed up by beginning to discuss the resources that had been removed that would make all this work requested by Provost Russell possible.

478. In response, Provost Russell walked out the room, leaving Professors Better and Washburn bewildered.

479. On November 15, 2018, Provost Russell sent notes of this meeting, including inaccurately low enrollment numbers, and outlining a new process by which Dr. Washburn would send a WGS syllabus to Professor Better, who would work with the Chair of Behavioral Sciences and Human Services to approve it.

480. To add insult to injury, Dr. Washburn was misgendered by Provost Russell.

481. Provost Russell ended her notes advising Professors Better and Washburn that this was to be considered "college service," not work for the WGS concentration, and suggesting the elimination of the co-director role.

482. On November 16, 2018, Professor Better stepped down as Co-Director of WGS, effective that day.

483. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor.

484. These events were also in retaliation for Dr. Washburn's complaints of discrimination.

485. These events were also in retaliation for Dr. Washburn's protected First Amendment activities.


### 18. <u>Harassment By Provost Russell At the WGS Office</u>

486. On November 14, 2018, Provost Russell entered the WGS Office with VP Rios, Dean Cook, and Public Safety without notice, while Dr. Washburn was in private consultation with three students.

487. Provost Russell loudly announced that she was now taking inventory of the office to move everything out, despite the ongoing private consultation with the students.

488. This was very disruptive to the meeting that the students were attempting to have with Dr. Washburn.

489. Dr. Washburn noted that they had accommodation requests in place seeking to delay the office move, and asked Provost Russell if those could be addressed prior to inventorying the office for removal.

490. Provost Russell replied that she would not address these issues because she was concerned about discussing matters involving Dr. Washburn's health in front of the students. She also stated that Human Resources had already denied those requests.

491. Dr. Washburn indicated that it was fine to discuss, given that Provost Russell had come to take inventory of the office despite open requests for accommodations, advising Provost Russell that they had submitted additional requests during their sick leave.

492. Dr. Washburn indicated that they had requested an interactive process regarding their accommodations, and that this inventory process preparatory to moving them out did not honor it, during a time when they could not undergo the physical and psychological stress of moving, even with assistance, because of arm and fatigue limitations.

493. In response, Provost Russell advised Dr. Washburn that Human Resources and Buildings and Grounds would be moving them out, and they should contact those offices.

494. The tone of this intrusion into a private meeting was very concerning to the students, who felt that Dr. Washburn was under attack by Provost Russell.

495. The students were correct in their assessment, although they did not necessarily know all of the facts of the discrimination and retaliation that Provost Russell had been directing at Dr. Washburn over a long period.

496. One of the students present was Dani Black. Dani is a queer, trans, and Jewish member of the LGBTQ Alliance student organization.

497. Dani was very concerned about what was rightly perceived as official harassment. Dani indicated to Provost Russell that this invasion was inappropriate and that they would be sending petitions to her about her conduct.

498. Dani later experienced official harassment from Kingsborough as a result of this airing of grievances.

499. Professor Washburn filed a report of harassment with Public Safety after this incident.

500. Neither Public Safety nor any Kingsborough official took any action on this report.

501. On November 15, 2018, Damali Dublin in the Office of Student Conduct emailed Dani Black, stating that Black was in violation of school rules because of "safety concerns."

502. Dani Black was put on probation.

503. Dani Black left the College due to psychological stress.

504. This was a pretext for retaliation against Dani Black because they spoke to Provost Russell in favor of Dr. Washburn and against the harassment that Provost Russell directed against Dr. Washburn.

505. Provost Russell directed this action against Dani Black in order to injure Dr. Washburn because Provost Russell knew that Dr. Washburn would be concerned about harassment against WGS students.

506. On November 16, 2018, Mickie Driscoll in Human Resources inappropriately rejected Dr. Washburn's additional accommodations request without the interactive process or cooperative dialogue.

507. She stated:

> After reviewing the request for an accommodation through an interactive process we are unable to accommodate Professor Washburn's request to delay the move from F115. We are offering an alternative accommodation of appropriate staff to pack and move all materials from F115 to their office or a storage area.

508. She justified the denial on the grounds that the space would be given to another program because WGS had less than 10 students enrolled over the past five years, and that WGS students would be advised by the staff in the Liberal Arts Office, which provides services to all Liberal Arts students.

509. Upon information and belief, she provided such reasoning with the approval, condonation and/or ratification of Provost Russell and Chair Ferretti.

510. This reasoning was false, and they all knew it to be a pretext for discrimination and retaliation against Dr. Washburn.

511. It was false because WGS services hundreds of students enrolled in WGS courses, not only those who have designated WGS as a concentration.

512. It was false because the Liberal Arts staff are not trained and knowledgeable in the subject matter of women's and gender studies necessary to provide competent advisement to students who are in the concentration, in WGS classes, or interested in WGS.

513. Dr. Washburn's physician had provided information that Dr. Washburn could not be ready to undertake the rigors of the move until February 1, 2019.

514. The evidence of Dr. Washburn's physician was ignored.

515. The denial of these reasonable accommodations negatively affected Dr. Washburn and the WGS program of which Dr. Washburn was co-Director.

516. These events were because of the Protected Categories, or with the Protected Categories as a motivating factor, and retaliation for prior protected activities by Dr. Washburn.


### 19. Sham Title IX Investigation

517. On October 12, 2018, Dr. Washburn filed a form with Kingsborough called Charge of Discrimination, relating the essence of the events referenced above.

518. On October 26, 2018, Dr. Washburn was called in to meet with Ms. Roxanna Thomas, Kingsborough's Title IX coordinator to discuss the Charge.

519. Ms. Thomas asked Dr. Washburn about their allegations of discrimination.

520. Dr. Washburn began to relate the events set forth above.

521. Ms. Thomas immediately interrupted Dr. Washburn and asked what this had to do with discrimination, and suggested that they were merely academic "squabbles."

522. Dr. Washburn began to explain how these events were related to their coming out as transgender and retaliation for complaints of discrimination.

523. Instead of listening to Dr. Washburn's requested explanation, Ms. Thomas routinely interrupted Dr. Washburn when they attempted to answer her questions, making it difficult to provide the information requested in a coherent manner.

524. The interruptions largely consisted of questioning Dr. Washburn's account in an exasperated, irritated and unprofessional manner, and making statements suggesting that Dr. Washburn's complaint did not relate to sex or gender.

525. She asked the question "how so?" in a skeptical tone of voice on many occasions when Dr. Washburn was providing details of the case.

526. She took few notes, and her inattention suggested that she appeared to be working on unrelated matters on her computer and answering her phone several times while Dr. Washburn was speaking.

527. Although, in response to questions from Ms. Thomas, Dr. Washburn provided names of other similarly situated faculty members who were treated differently, Ms. Thomas repeatedly stated that other faculty members were not treated differently and requested names of other faculty members who were treated differently.

528. She stated that she would only address sex discrimination issues, and not other issues, such as retaliation.

529. She indicated that she believed that Kingsborough bore no responsibility for matters that occurred prior to the formal lodging of notification with Human Resources on their forms, although it is clear that Dr. Washburn communicated their concerns about sex and disability issues over the summer.

530. Ms. Thomas appeared to be acting as a partisan on behalf of the College, rather than a neutral investigator of the facts.

531. Ms. Thomas did so because of retaliation against Dr. Washburn for raising a complaint against her boss, Provost Russell.

532. On October 29, 2018, Dr. Washburn's attorney wrote to Chancellor Rabinowitz and Julie Block, an attorney for Kingsborough.

533. She requested that Ms. Thomas be recused from the investigation due to bias and inattention.

534. The College refused to recuse Ms. Thomas.

535. Ms. Thomas conducted no further investigation with the witnesses mentioned by Dr. Washburn.

536. Dr. Washburn provided additional information to Ms. Thomas, but received no reply or acknowledgement.

537. Ms. Thomas issued a two-page report finding Dr. Washburn's complaint to be without merit.

538. She did so in retaliation for Dr. Washburn raising complaints against her boss, Provost Russell.

539. The report contained factual errors and much of the substance of Dr. Washburn's complaints of discrimination and retaliation were simply ignored.

540. Provost Russell was aware of the bias exhibited by Ms. Thomas, the factual errors in the report, and the lack of discussion or investigation of the substance of Dr. Washburn's complaints of discrimination and retaliation.

541. On June 23, Provost Russell posted a public message citing the sham Kingsborough investigation as evidence that "no discrimination was found."

542. Provost Russell approved, condoned and ratified the sham investigation conducted by Ms. Thomas in retaliation for Dr. Washburn raising a complaint against her.

### 20. Discussion at the College Council Confirmed that Provost Russell's Actions Were Not Justified By Academic Process

543. On November 15, 2018, Dr. Washburn attended College Council as a Delegate At Large.

544. Under New Business, Professor Washburn asked about curricular procedure and procedures pertaining to concentrations.

545. President Schrader responded, describing the proper process to move a concentration into a department, to create a major, to create a department, to cross-list a class, and to create a WGS email and listserv.

546. President Schrader's response directly contradicted Provost Russell's responses to Dr. Washburn on October 23, 2018 regarding WGS, as well as her improper course of action regarding WGS.

547. The Council's Professor Ed Martin reiterated the process required for moving a concentration, that it must be approved by the Department, the Curriculum Committee, the College Council, the Board of Trustees, and the State.

548. This too, contradicted Provost Russell's responses to Dr. Washburn regarding WGS, as well as her improper course of action regarding WGS.

549. Professor Washburn noted that they were told that WGS was now in BEH, and asked if this curricular process had been followed.

550. Professor Martin said he was not aware that any such change had taken place.

551. President Schrader and Professor Michael Sokolow, the College Council Secretary, then turned to Provost Russell for an explanation.

552. Provost Russell acknowledged WGS was under the supervision of the Behavioral Sciences and Human Services Department, but was still in Liberal Arts, without the curricular process.

553. President Schrader instructed Dr. Washburn to schedule a follow-up meeting with the Provost regarding this.

### 21. Provost Russell Ignored President Schrader's Explication of Proper Academic Process

554. After the meeting, an hour later, Provost Russell sent Dr. Washburn information about the curricular changes moving WGS to BEH, which clearly departed from the college and CUNY policy outlined at the College Council meeting.

555. The next day, on November 16, 2018, Dr. Washburn asked for a follow-up meeting with Provost Russell, Professor Greenberg, and Ms. Emma Powell from the PSC-CUNY union to discuss the improper removal of WGS to BEH.

556. The meeting was never held, and these issues were never resolved, affecting Dr. Washburn and the WGS department adversely because Dr. Washburn's position as co-Director of WGS held no formal curricular role.

### 22. Dr. Washburn Learns That Provost Russell and Chair Ferretti Conspired Against Dr. Washburn and WGS Because of Discrimination and Retaliation

557. On January 30, 2019, Dean Sharon Warren Cook told Dr. Washburn that Chair Eileen Ferretti would not support the WGS program in the English Department "for obvious reasons," and that Chair Ferretti and Provost Russell spoke about removing WGS.

558. When Dr. Washburn asked what those obvious reasons were, Dean Warren Cook said WGS was moved to the Behavioral Sciences and Human Services Department because "she [English Chair Ferretti] doesn't want to have to deal with you."

559. She later falsely denied this in an email.

560. This was a reference to Dr. Washburn's complaints of discrimination based on the Protected Categories and retaliation for making those complaints.

561. This information was confirmed by colleagues in June 2019.

562. Dr. Washburn also later learned that, in the winter of 2018, after many complaints by Dr. Washburn about discrimination and retaliation, Chair Ferretti had a private meeting with Provost Russell to remove all WGS designations of English classes, except Women and Literature, including Dr. Washburn's class.

563. As of January 3, 2019, Provost Russell barred students from the WGS office unless Dr. Washburn was present.

564. The intent and effect of this was to prevent the office from continuing to operate as the community center for WGS students, effectively breaking up WGS as a force in students' lives.

565. These events had an adverse effect on Dr. Washburn because Dr. Washburn's position as Director of WGS. They had no intellectual space to do their WGS work with faculty and students.

566. These actions were taken because of discrimination based on the Protected Categories and retaliation.

567. On February 25, 2019, Dr. Washburn emailed chairs about the new WGS "attribute" – a reference to cross-listing of courses – to help students look for WGS classes.

568. Dean Cook responded the same day that many of the classes that were formerly part of WGS had been removed from the program in the revised College Catalog.

569. Dr. Washburn and others in WGS, including the WGS Faculty Advisory Board, were surprised, because this had been done without any consultation of the Board or Director.

570. They were also astonished to find that the College Catalog names Dr. Washburn using the incorrectly gendered former name that Dr. Washburn had changed on college records.

571. This reference to an incorrectly gendered former name was offensive and hurtful to Dr. Washburn, and would be offensive and hurtful to any reasonable transgender person.

572. As of October 2019, WGS is not searchable as a program in the CUNYFirst database, so students have to click on each of the hundreds of courses to see if the course fulfills their requirements, many of which were removed from the catalog without approval of Dr. Washburn or the WGS advisory board.

573. The intent and effect of this was to effectively end Dr. Washburn's position as co-Director of WGS, as it disempowered them, leaving them just with a title.

574. This was done because of the Protected Categories and because of retaliation.

575. On April 9, 2019, seeing that nothing had been done by Provost Russell or Chair Ferretti to address these concerns, Dr. Washburn sent an email to WGS and Liberal Arts faculty, inviting faculty to participate in forming a committee to discuss curricular concerns connected to WGS and interdisciplinary studies in Liberal Arts.

576. This was an attempt to develop a mechanism for interdisciplinary work that the current college governance structure had removed, and to re-establish the academic interdisciplinary fields using the College's own governance structure as a College Council delegate.

577. Provost Russell was forwarded a copy of Dr. Washburn's email, and responded,

> I wanted you to be aware that Michael Sokolow has shared your request with members of the Curriculum Committee, which is his obligation. You have been informed by multiple constituencies at the College about the governance process for making changes to courses, concentrations, and programs.

578. Dr. Washburn was not attempting to make changes, but to discuss making changes.

579. Obviously Dr. Washburn had been informed of the process, as it was Provost Russell who had ignored the process and Dr. Washburn who had to constantly remind her of her failure to use the process in making the unauthorized changes to WGS that she had.

580. Since Provost Russell's email about the governance process to Dr. Washburn was obviously redundant, Dr. Washburn reasonably perceived that Provost Russell was attempting to communicate something else, a warning or a threat to further retaliate against Dr. Washburn if they met with College faculty regarding WGS.

581. Dr. Washburn advised Provost Russell of their concern about retaliation, and attempted to confirm the meaning of Provost Russell's redundant email:

> I take this threat seriously. I take it as your advice that my discussing WGS with faculty, which is my right and my obligation, as director, as a delegate, and as a trans, gender non-conforming nonbinary faculty member, will engender retaliation against me. I am concerned, as any reasonable person would be. I recognize the attempt to silence me about WGS through threat of punishment. This is unacceptable, and I would like to request that you clarify your response.

582. Provost Russell protested that no overt threats could be proved from her words:

> "There is nothing in my email that discourages you from expanding the advisory board of WGS or discussing WGS with faculty. There is nothing in my email that can be inferred as an attempt to silence you or threaten discipline. As simply stated in my email: if you wish to propose changes to WGS, there is an existing governance process that applies to all faculty."

583. The text of Provost Russell's email, however, obviously had as its subject matter the proposed meeting with WGS faculty and was intended to and had the effect of discouraging Dr. Washburn from meeting with faculty.

584. The statement that Provost Russell wished to remind Dr. Washburn of the process for changing WGS is belied by the fact that it was Dr. Washburn who had constantly

reminded Provost Russell of this fact, and Provost Russell who had ignored the process

and Dr. Washburn's protests about the failure to observe process.

### 23. <u>Associate Professor Dr. Washburn Was Relegated to A Tiny Storage Closet Retaliation For Complaints</u>

585. On February 15, 2019, Dr. Washburn again underwent surgery.

586. On February 25, 2019, they were locked out of the WGS office.

587. They were also notified that their accommodations were removed.

588. In addition, the WGS office signage was removed, and the interior of the office appeared to be gutted.

589. Dr. Washburn has been unable to locate, despite diligent inquiry, the WGS archives and files, computer, phone, and scanner, and a number of personal belongings, such as art, student projects, awards, familial mementos from their grandmother, and pictures.

590. Dr. Washburn asked to have a new office assigned, one that would be suitable for them as a person with a disability and one that was suitable for their position as director of WGS, i.e., it would accommodate meetings.

591. Instead, on February 27, 2019, Dr. Washburn was assigned Room M120.

592. Room M 120 is unsuited to a person with Dr. Washburn's disabilities and accommodations.

593. Provost Russell and the other Defendants were aware of this.

594. Room M120 is, in reality, a tiny storage closet.

595. It was heretofore utilized as storage for boxes and files.

596. It has no room to sit or for a desk.

597. Room M120 is next to a high voltage closet plastered with warnings about dangerous voltage.

598. Room M120 has no window and no ventilation, and is extremely hot.

599. Dr. Washburn found that it was contaminated with mold and airborne contaminants.

600. After being in that office for a short time, Dr. Washburn has experienced physical symptoms that suggest reaction to mold and airborne contaminants.

601. When Dr. Washburn contacted Defendants' security personnel about these problems, they advised Dr. Washburn that they should not use the room.

602. Due to the materials stored in Room M120, there is no room for Dr. Washburn's files or equipment.

603. Room M120 has insufficient shelves to hold books and student projects.  The office has no file cabinet.

604. Despite all these obvious problems, Dr. Washburn's belongings were moved into Room M120.

605. On February 28, 2019, Dr. Washburn was advised that Room M120 would be their office until May 15, 2019.


### 24. <u>Further Discrimination and Retaliation Against Dr. Washburn and WGS</u>

606. In the planning and scheduling of the Fall 2019 and Spring 2020, Defendants continued their campaign against WGS and Dr. Washburn.

607. In May 2019, Chair Ferretti, with, upon information and belief, the approval, condonation and/or ratification of Provost Russell, removed Dr. Washburn from the Strategic Planning Committee.

608. Dr. Washburn was replaced with a white cisgender heterosexual male who was not on the College Council, which Council membership is a requirement for serving on the Strategic Planning Committee.

609. Dr. Washburn was told that their removal and replacement was "for diversity," meaning that it was because of the Protected Categories.

610. It was also in retaliation for the complaints of discrimination made by Dr. Washburn.

611. In addition, Defendants acted to make WGS courses more difficult to identify without any academic justification.

612. They also increased enrollment requirements for WGS courses, removed the WGS designation from offered courses, refused to offer WGS courses, scheduled WGS courses at atypical times, and scheduling and then cancelling WGS courses, all with the intent and effect of making it difficult for students to take the courses and to retaliate against Dr. Washburn by retaliating against the concentration they had worked so hard to make successful.

613. Defendants also refused to bestow upon graduating students, such as Tania Rodriquez, Iman Derrick, and Kendra Suarez, the WGS designation on their degree, with the intent and effect of retaliating against Dr. Washburn.

614. All of these efforts are designed to discourage students from taking WGS courses, pursuing a WGS designation on their degree, and to further marginalize Dr. Washburn.

615. In Fall 2019, Defendants gave Dr. Washburn a fully online course schedule to keep them off campus and to marginalize and silence them.

616. In September 2019, Dr. Washburn was moved to office F331.

617. Their belongings are still missing.

618. Dr. Washburn had great difficulties with their Spring 2020 schedule, which was changed and switched around to different courses and days, which caused problems for Dr. Washburn's accommodations while continuing to recover from surgery.

619. Prior to beginning their transition, Dr. Washburn did not experience any of the above difficulties with schedules, enrollments, course offerings, and students' degrees were not refused.

620. On information and belief, other similarly situated professors and degree concentrations do not experience the difficulties that Dr. Washburn and WGS has experienced.

## 25. **Denial of Transfer As Retaliation**

621. On December 18, 2018, Dr. Washburn requested a transfer to another college within the CUNY system because of the discrimination and retaliation detailed above.

622. They discussed this possibility with chair, directors, and coordinators at Hunter College, Brooklyn College, and Queens College, all of whom supported such a transfer, but require administrative approval.  They have worked part-time in English and Women and Gender Studies at Hunter College since 2010. They started working part-time in Women's and Gender Studies at Brooklyn College in 2019, because Hunter could not afford to pay Dr. Washburn overload.

623. They requested a transfer again on July 19, 2019.

624. Defendants have blocked Dr. Washburn's transfer request.

625. Chair Ferretti has also declined to meet with Dr. Washburn to discuss supporting their sabbatical application, which must be signed by February 1, because of discriminatory and retaliatory motives.

626. She gave as an excuse that she was having dental work the last two weeks of January, yet the English Department staff has advised that she is, in fact, in the office the last week of January in preparation for meetings for promotion and fellowships.

627. On January 21, 2020, Dr. Washburn was awarded an appointment to teach in Women's and Gender Studies at the CUNY Graduate Center.

628. Dr. Washburn accepted this position to teach Feminist Texts and Theories for Fall 2021 and Fall 2022.

629. This appointment requires the approval of Chair Ferretti and Provost Russell.

630. Upon information and belief, Chair Ferretti and Provost Russell intend to block Dr. Washburn's appointment.

631. These events are because of the Protected Categories or with the Protected Categories as a motivating factor, and retaliation for prior protected activities, including discrimination complaints and First Amendment protected activities.

632. Because prompt and effective action was not taken by Defendants to address their different treatment and the hostile work environment over many months, Dr. Washburn's environment grew increasingly hostile, and the different treatment began to take a toll on their physical, emotional, and mental health.

633. Defendants did not take prompt or effective action to address this issue, and Dr. Washburn feared this occurring again, causing them much emotional distress.

634. Dr. Washburn has experienced retaliation as a result of the complaints regarding gender discrimination.

635. Dr. Washburn has experienced retaliation as a result of their First Amendment protected activities.

636. Employees who have supported Dr. Washburn's complaints regarding gender discrimination have also experienced retaliation as a result of their opposing discrimination.

637. As a result of all of the foregoing events, Dr. Washburn's working conditions have become intolerable to them.

638. Given the foregoing events, any reasonable person in Dr. Washburn's position would feel that their working conditions have become intolerable.

## CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 2000e, et seq.
### Title VII

**Hostile Work Environment Because of Sex**
**(Against Defendants Kingsborough and CUNY)**

639.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

640.   Plaintiff is a member of a protected category with regard to sex.

641.   After Plaintiff's trans non-conforming gender expression was disclosed, Defendant Kingsborough's faculty and administrators instituted a campaign of harassment and discrimination on the basis of sex and sex stereotyping, including gender and gender expression, and adopted adversarial attitudes and hostile demeanors.

642.   This harassment was frequent, severe and pervasive, physically threatening, and continues.

643.   Plaintiff was targeted for harassment and subjected to a hostile work environment by managers and employees because of their sex and sex stereotyping, including gender and gender expression.

644.   The discriminatory acts as detailed herein, occurred frequently, were perpetuated and/or directed by the same core group of managers and employees, were egregious, numerous and concentrated, and formed part of a hostile work environment.

645.   The discriminatory acts were unwelcome to Plaintiff.

646.   Discriminatory intimidation, marginalization, ostracism, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive working environment, as detailed herein.

647.   Defendants' professors and administrators repeatedly misgendered Plaintiff.

648.   This hostile environment unreasonably interfered with Plaintiff's ability to perform job duties, which flowed directly from Defendants' failure to take prompt and effective action to stop the hostile work environment.

649.   The effects of the hostile environment alleged herein were felt by Plaintiff daily. For instance, Plaintiff felt humiliation and despair as a result of their reasonable fear of continued harassment at any moment, their being referred to continually and intentionally by the wrong name and wrong gender references.

650.   The hostile environment was severe.

651.   Many events contributing to this hostile work environment occurred within the 300-day period prior to Plaintiff's EEOC charge.

652.   Plaintiff perceived the working environment to be abusive or hostile.

653.   A reasonable person in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

654.   Defendants' actions occurred because of Plaintiff's sex in that they are non-binary trans gender non-conforming.

655.   Defendants Kingsborough and CUNY were on notice of the hostile work environment, including actual notice by means of complaints made by Plaintiff to Provost Russell and Chair Ferretti, as detailed herein.

656.   Defendants did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

657.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendant's unlawful hostile work environment.

**COUNT 2**
**42 U.S.C. § 2000e, et seq.**
**Title VII**
**Discrimination Because of Sex**
**(Against Defendants Kingsborough and CUNY)**

658.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

659.   Defendants discriminated against Plaintiff in the terms, conditions, or privileges of employment based on gender and gender identity by denying them work opportunities afforded to other, gender-conforming employees.

660.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

## COUNT 3
### 42 U.S.C. § 2000e, et seq.
### Title VII
### Retaliation
### (Against Defendants Kingsborough and CUNY)

661.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

662.   Plaintiff engaged in protected activity by protesting their disparate treatment by the Defendants.

663.   Plaintiff engaged in protected activity by protesting the marginalization of WGS and their support of the students' protests.

664.   By filing complaint with the City of New York Commission on Human Rights, cross-filed with the United States Equal Employment Opportunity Commission, Plaintiff engaged in activities protected by Title VII.

665.   Plaintiff's exercise of protected rights was known to Defendants.

666.   Following and because of Plaintiff's Title VII protected conduct, Plaintiff was harassed, subjected to a sexually hostile work environment and threatened with and subjected to tangible or  adverse employment actions.

667.   The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

668.   Defendants retaliated against Plaintiff because of their protected activity all in violation of Title VII and Title I of the Civil Rights Act of 1991.

669.   Defendants failed to promptly investigate and correct the retaliation.

670.   By engaging in the conduct described above, Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by Title VII.

671.  As a direct and proximate result of Defendants unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 4**
**20 U.S.C. § 1681, et seq.**
**Title IX**
**Hostile Work Environment Because of Sex**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Barnhart, Thomas)**

672.  Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

673.  Plaintiff is a member of a protected category with regard to sex.

674.  After Plaintiff's trans non-conforming gender expression was disclosed, Defendant Kingsborough's faculty and administrators instituted a campaign of harassment and discrimination on the basis of sex and sex stereotyping, including gender and gender expression, and adopted adversarial attitudes and hostile demeanors.

675.  This harassment was frequent, severe and pervasive, physically threatening, and continues.

676.  Plaintiff was targeted for harassment and subjected to a hostile work environment by managers and employees because of their sex and sex stereotyping, including gender and gender expression.

677.  The discriminatory acts as detailed herein, occurred frequently, were perpetuated and/or directed by the same core group of managers and employees, were egregious, numerous and concentrated, and formed part of a hostile work environment.

678.  The discriminatory acts were unwelcome to Plaintiff.

679.  Discriminatory intimidation, marginalization, ostracism, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive working environment, as detailed herein.

680.  Defendants' professors and administrators repeatedly misgendered Plaintiff.

681.   This hostile environment unreasonably interfered with Plaintiff's ability to perform her job duties, which flowed directly from Defendants' failure to take prompt and effective action to stop the hostile work environment.

682.   The effects of the hostile environment alleged herein were felt by Plaintiff daily. For instance, Plaintiff felt humiliation and despair as a result of their reasonable fear of continued harassment at any moment, their being referred to continually and intentionally by the wrong name and wrong gender references.

683.   The hostile environment was severe.

684.   Plaintiff perceived the working environment to be abusive or hostile.

685.   A reasonable person in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

686.   Defendants' actions occurred because of Plaintiff's sex in that they are non-binary trans gender non-conforming.

687.   Defendants Kingsborough and CUNY were on notice of the hostile work environment, including actual notice by means of complaints made by Plaintiff to Provost Russell and Chair Ferretti, as detailed herein.

688.   Defendants acted intentionally or in a manner deliberately indifferent to the rights of Dr. Washburn.

689.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendant's unlawful hostile work environment.


**COUNT 5**
**42 U.S.C. § 1983**
**United States Constitution**
**First Amendment Freedom of Speech**
**(Against Defendants Russell, Ferretti, Capozzi, Barnhart)**

690.   Plaintiff realleges and incorporates herein the foregoing paragraphs as though fully

restated herein.

691.   42 U.S.C. §1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, or any State * * *, subjects, or causes to be subjected, any citizen of
> the United States * * * to the deprivation of any right, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress.

692.   As a public employee, the First Amendment to the United States Constitution guarantees

Plaintiff the right to express themself on matters of public concern without fear of unjust

retaliation.

693.   Plaintiff engaged in speech related to matters of political, social, educational, and public

concern to the Kingsborough community when they protested the treatment of the students,

protested the marginalization of WGS, spoke up at faculty meetings and seminars, and wrote

the news article.

694.   Plaintiff's speech referenced above was protected by the First Amendment to the United

States Constitution.

695.   Plaintiff engaged in speech protected by the Equal Protection Clause of the United States

Constitution and the Due Process Clause of the United States Constitution when they crafted

their appearance to be appropriate to their trans non-binary gender non-conforming person.

696.   Plaintiff's speech, in wearing clothing appropriate to their non-binary gender, was protected

by the First Amendment to the United States Constitution.

697.   Plaintiff's speech, in adopting plural pronouns and changing their name, was protected by

the First Amendment to the United States Constitution.

698.   In direct retaliation for their exercise of protected speech and to deter their free speech, Defendants intentionally retaliated against Plaintiff by the differential treatment of, and adverse actions taken against, Plaintiff in the manner described in the preceding paragraphs.

699.   The Individual Defendants actively engaged in this differential treatment and retaliation.

700.   The Individual Defendants had actual or constructive knowledge that subordinates, as detailed above, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff.

701.   The Individual Defendants' own conduct and participation in the offensive practices demonstrates deliberate indifference to Plaintiff's constitutional rights.

702.   The Individual Defendants' response to the knowledge of the actions of subordinates was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices.

703.   There was an affirmative causal link between the Individual Defendants' actions and inaction and the constitutional injury suffered by Plaintiff.

704.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not rationally related to any governmental interest.

705.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not substantially related to any important governmental interest.

706.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not narrowly tailored to achieving any compelling governmental interest.

707.   The differential treatment of, and adverse actions taken against Plaintiff were undertaken by governmental policymakers with final authority to establish policy with respect to the actions

taken against Plaintiff, or had been delegated the same, and the differential treatment and misconduct constituted the governmental policy and practice of the Defendant Kingsborough.

708.   The Individual Defendants acted under color of state law and knew or reasonably should have known that the conduct alleged above would violate Plaintiff's constitutional rights.

709.   The Individual Defendants' conduct was a cause in fact of Plaintiff's differential treatment and the adverse actions taken against them.

710.   As a result of the above-described wrongful conduct, Plaintiff's constitutional rights were violated.

711.   As a direct result of the defendants' conduct, Plaintiff has suffered lost wages and benefits, lost seniority, lost promotion, lost future earnings, lost employment opportunities, humiliation, embarrassment, loss of self-esteem, damage to their reputation, attorneys' fees and costs of suit.

**COUNT 6**
**42 U.S.C. § 1983**
**United States Constitution**
**Equal Protection Clause and Due Process Clause**
**(Against Defendants Russell, Ferretti, Driscoll, Thomas, Capozzi)**

712.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

713.   42 U.S.C. §1983 provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State * * *, subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any right, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

714.   On information and belief, no other employee of Defendant Kingsborough similarly situated to Plaintiff has been subjected to the differential treatment and adverse actions Plaintiff received as described in the preceding paragraphs.

715.   As a result of Plaintiff's gender and gender expression, Defendant intentionally targeted Plaintiff for differential treatment and adverse employment actions.

716.   The differential treatment of, and adverse employment actions taken against, Plaintiff as described in the preceding paragraphs, were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not rationally related to any governmental interest.

717.   The reasons given by Defendant for these actions against Plaintiff were a pretext for discrimination based on gender and gender expression.

718.   The differential treatment of, and adverse actions taken against, Plaintiff were undertaken by governmental policymakers with final authority to establish policy with respect to the actions ordered, or had been delegated the same, and the differential treatment and misconduct constituted the governmental policy and widespread practice of the Defendant.

719.   The Defendant and its agents and employees acted under color of state law and knew or reasonably should have known that their conduct would violate Plaintiff's constitutional rights.

720.   The Defendant's conduct was a cause in fact of Plaintiff's differential treatment and the adverse actions taken against them.

721.   Plaintiff's gender and gender expression are a matter of individual right and privacy and may not be dictated by government officials.

722.   Plaintiff has a right of autonomy applicable to their gender and gender expression.

723.   As a result of the above-described wrongful conduct, Plaintiff's constitutional rights were violated.

724.   As a direct result of the Defendant's conduct, Plaintiff has suffered lost wages and benefits, lost seniority, lost promotion, lost future earnings, lost employment opportunities, humiliation, embarrassment, loss of self-esteem, damage to their reputation, attorneys' fees and costs of suit.

**COUNT 7**
**New York State Constitution**
**Article I, §8 Freedom of Speech**
**(Against Defendants Russell, Ferretti, Capozzi, Barnhart)**

725.   Plaintiff realleges and incorporates herein the foregoing paragraphs as though fully restated herein.

726.   As a public employee, the New York State Constitution, Article I, § 8 guarantees Plaintiff the right to express themselves on matters of public concern without fear of unjust retaliation.

727.   Plaintiff engaged in speech related to matters of political, social, educational, and public concern to the Kingsborough community when they protested the treatment of the students, protested the marginalization of WGS, spoke up at faculty meetings and seminars, and wrote the news article.

728.   Plaintiff's speech referenced above was protected by the New York State Constitution.

729.   Plaintiff engaged in speech protected by the Equal Protection Clause of the United States Constitution and the Due Process Clause of the United States Constitution when they crafted their appearance to be appropriate to their trans non-binary gender non-conforming person.

730.   Plaintiff's speech, in wearing clothing appropriate to their non-binary gender, was protected by the First Amendment to the United States Constitution.

731.   Plaintiff's speech, in adopting plural pronouns and changing their name, was protected by the First Amendment to the United States Constitution.

732.   In direct retaliation for their exercise of protected speech and to deter their free speech, Defendants intentionally retaliated against Plaintiff by the differential treatment of, and adverse actions taken against, Plaintiff in the manner described in the preceding paragraphs.

733.   The Individual Defendants actively engaged in this differential treatment and retaliation.

734.   The Individual Defendants had actual or constructive knowledge that subordinates, as detailed above, were engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiff.

735.   The Individual Defendants' own conduct and participation in the offensive practices demonstrates deliberate indifference to Plaintiff's constitutional rights.

736.   The Individual Defendants' response to the knowledge of the actions of subordinates was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices.

737.   There was an affirmative causal link between the Individual Defendants' actions and inaction and the constitutional injury suffered by Plaintiff.

738.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not rationally related to any governmental interest.

739.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not substantially related to any important governmental interest.

740.   The differential treatment of, and adverse actions taken against Plaintiff were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not narrowly tailored to achieving any compelling governmental interest.

741.   The differential treatment of, and adverse actions taken against Plaintiff were undertaken by governmental policymakers with final authority to establish policy with respect to the actions taken against Plaintiff, or had been delegated the same, and the differential treatment and misconduct constituted the governmental policy and practice of the Defendant Kingsborough.

742.   The Individual Defendants acted under color of state law and knew or reasonably should have known that the conduct alleged above would violate Plaintiff's constitutional rights.

743.   The Individual Defendants' conduct was a cause in fact of Plaintiff's differential treatment and the adverse actions taken against them.

744.   As a result of the above-described wrongful conduct, Plaintiff's constitutional rights were violated.

745.   As a direct result of the defendants' conduct, Plaintiff has suffered lost wages and benefits, lost seniority, lost promotion, lost future earnings, lost employment opportunities, humiliation, embarrassment, loss of self-esteem, damage to their reputation, attorneys' fees and costs of suit.

**COUNT 8**
**New York State Constitution**
**Article 1 § 6 Due Process Clause**
**(Against Defendants Russell, Ferretti, Driscoll, Thomas, Capozzi)**

746.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

747.   On information and belief, no other employee of Defendant Kingsborough similarly situated to Plaintiff has been subjected to the differential treatment and adverse actions Plaintiff received as described in the preceding paragraphs.

748.   As a result of Plaintiff's gender and gender expression, Defendant intentionally targeted Plaintiff for differential treatment and adverse employment actions.

749.   The differential treatment of, and adverse employment actions taken against, Plaintiff as described in the preceding paragraphs, were intentional, malicious and arbitrary, motivated by nefarious and discriminatory purpose, and were not rationally related to any governmental interest.

750.   The reasons given by Defendant for these actions against Plaintiff were a pretext for discrimination based on gender and gender expression.

751.   The differential treatment of, and adverse actions taken against, Plaintiff were undertaken by governmental policymakers with final authority to establish policy with respect to the actions ordered, or had been delegated the same, and the differential treatment and misconduct constituted the governmental policy and widespread practice of the Defendant.

752.   The Defendant and its agents and employees acted under color of state law and knew or reasonably should have known that their conduct would violate Plaintiff's constitutional rights.

753.   The Defendant's conduct was a cause in fact of Plaintiff's differential treatment and the adverse actions taken against them.

754.   Plaintiff's gender and gender expression are a matter of individual right and privacy and may not be dictated by government officials.

755.   Pursuant to the New York State Constitution, Article I, § 6, Plaintiff has a right of autonomy applicable to their gender and gender expression.

756.   As a result of the above-described wrongful conduct, Plaintiff's constitutional rights were violated.

757.   As a direct result of the Defendant's conduct, Plaintiff has suffered lost wages and benefits, lost seniority, lost promotion, lost future earnings, lost employment opportunities, humiliation, embarrassment, loss of self-esteem, damage to their reputation, attorneys' fees and costs of suit.

**COUNT 9**
**42 U.S.C. §12101, et seq.**
**Hostile Work Environment Because of Disability**
**(Against Defendants Kingsborough and CUNY)**

758.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

759.   After Plaintiff's trans non-conforming gender was disclosed, Defendant Kingsborough's faculty and administrators instituted a campaign of harassment and discrimination on the basis of Plaintiff's Protected Categories, including gender dysphoria, and physical limitations due to gender-confirming surgery, and other physical and mental impairments.

760.   Defendants subjected Plaintiff to a hostile work environment because of their disabilities, including gender dysphoria and physical limitations due to gender-confirming surgery.

761.   The discrimination experienced by the Plaintiff was because of their disability or Defendants' perception of them as disabled.

762.   Defendants did not undertake prompt or effective efforts sufficient to stop the hostile environment.

763.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred

damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury,damage to their professional reputation, and other pecuniary

and non-pecuniary losses, which damages would not have occurred but for Defendants'

unlawful hostile work environment.

**COUNT 10**
**42 U.S.C. §12101, et seq.**
**Refusal to Reasonably Accommodate**
**(Against Defendants Kingsborough and CUNY)**

764.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

765.   Defendants refused Plaintiff's requests for reasonable accommodation in violation of the

ADA.

766.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred

damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury,damage to their professional reputation, and other pecuniary

and non-pecuniary losses, which damages would not have occurred but for Defendants'

discrimination.

**COUNT 11**
**42 U.S.C. §12101, et seq.**
**Discrimination**
**(Against Defendants Kingsborough and CUNY)**

767.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

768.   Defendants subjected Plaintiff to disparate treatment in the terms and conditions of their

employment because of their disability or perceived disability in violation of the ADA.

769.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred

damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury,damage to their professional reputation, and other pecuniary

and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

**COUNT 12**
**42 U.S.C. §12101, et seq.**
**Retaliation**
**(Against Defendants Kingsborough and CUNY)**

770.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

771.   Plaintiff engaged in protected activity by protesting their disparate treatment by the Defendants.

772.   Plaintiff engaged in protected activity by protesting the Defendants' refusal to accommodate them.

773.   Defendants retaliated against Plaintiff because of their protected activity all in violation of the ADA.

774.   By filing complaint with the City of New York Commission on Human Rights, Plaintiff engaged in activities protected by ADA.

775.   Plaintiff's exercise of protected rights was known to Defendants.

776.   Following and because of Plaintiff's ADA protected conduct, Plaintiff was harassed, subjected to a hostile work environment and threatened with and subjected to tangible or adverse employment actions.

777.   The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

778.   By engaging in the conduct described above, Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by ADA.

779.   As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 13**
**NYHRL §290, et seq.**
**Discrimination Because of Sex**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Thomas, Capozzi and Chung)**

780.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

781.   Defendants discriminated against Plaintiff in the terms, conditions, or privileges of employment based on gender and gender identity by denying them work opportunities afforded to other, gender-conforming employees and allowing a hostile work environment because of their gender.

782.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

**COUNT 14**
**NYHRL §290, et seq.**
**Retaliation Because of Sex**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Thomas, Capozzi and Chung)**

783.   Plaintiff engaged in protected activity by protesting their disparate treatment by the Defendants.

784.   Plaintiff engaged in protected activity by protesting the marginalization of WGS and their support of the students' protests.

785.   Defendants retaliated against Plaintiff because of their protected activity all in violation of the NYHRL §290, et seq.

786.   By filing complaint with the City of New York Commission on Human Rights, Plaintiff engaged in activities protected by the NYHRL.

787.   Plaintiff's exercise of protected rights was known to Defendants.

788.   Following and because of Plaintiff's NYHRL protected conduct, Plaintiff was harassed, subjected to a sexually hostile work environment and threatened with and subjected to tangible or adverse employment actions.

789.   The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

790.   By engaging in the conduct described above, Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's state protected rights to oppose practices that are prohibited by NYHRL §290.

791.   As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 15**
**NYHRL §290**
**Discrimination Because of Disability**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

792.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein. After Plaintiff's trans non-conforming gender was disclosed, Defendants instituted a campaign of harassment and discrimination on the basis of Plaintiff's non-conforming gender identity, i.e., their gender dysphoria.

793.   Defendants subjected Plaintiff to a hostile work environment because of their disabilities, including gender dysphoria and physical limitations due to gender-confirming surgery, in violation of NYHRL §290.

794.   The discrimination experienced by the Plaintiff was because of their disabilities or Defendants' perception of them as disabled.

795.   Defendants did not undertake prompt or effective efforts sufficient to stop the hostile environment.

796.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' unlawful hostile work environment.

## COUNT 16
### NYHRL §290, *et seq.*
### Refusal to Reasonably Accommodate
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

797.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

798.   Defendants refused Plaintiff's requests for reasonable accommodation in violation of the NYHRL §290.

799.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

## COUNT 17
### NYHRL §290, et seq.
### Retaliation because of Disability
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

800.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

801.   Plaintiff engaged in protected activity by protesting their disparate treatment by the Defendants.

802.   Plaintiff engaged in protected activity by protesting the Defendants' refusal to accommodate them.

803.   Defendants retaliated against Plaintiff because of their protected activity all in violation of the NYHRL §290.

804.   By filing complaint with the City of New York Commission on Human Rights, Plaintiff engaged in activities protected by NYHRL.

805.  Plaintiff's exercise of protected rights was known to Defendants.

806.  Following and because of Plaintiff's NYHRL protected conduct, Plaintiff was harassed, subjected to a hostile work environment and threatened with and subjected to tangible or adverse employment actions.

807.  The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

808.  By engaging in the conduct described above, Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by NYHRL.

809.  As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

## COUNT 18
## NYCAC §8-101(a)
## Discrimination Because of Sex, Gender, and Gender Identity
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Thomas, Capozzi and Chung)**

810.  Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

811.  Defendants discriminated against Plaintiff in the terms, conditions, or privileges of employment based on their sex, gender, and/or gender identity by denying them work opportunities afforded to other, gender-conforming employees and allowing a hostile work environment because of their gender.

812.  As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary

and non-pecuniary losses, which damages would not have occurred but for Defendants'
discrimination.

**COUNT 19**
**NYCAC §8-107**
**Retaliation**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Thomas, Barnhart,**
**Capozzi and Chung)**

813.   Plaintiff engaged in protected activity by protesting their disparate treatment by the
Defendants.

814.   Plaintiff engaged in protected activity by protesting the marginalization of WGS and their
support of the students' protests.

815.   By filing complaint with the City of New York Commission on Human Rights, Plaintiff
engaged in activities protected by the NYCAC.

816.   Plaintiff's exercise of protected rights was known to Defendants.

817.   Following and because of Plaintiff's NYCAC protected conduct, Plaintiff was harassed,
subjected to a sexually hostile work environment and threatened with and subjected to tangible
or adverse employment actions.

818.   The actions taken against Plaintiff would dissuade a reasonable employee from making or
supporting a complaint of discrimination.

819.   Defendants retaliated against Plaintiff because of their protected activity all in violation of
the NYCAC §8-107.

820.   By engaging in the conduct described above, Defendants intentionally retaliated against
Plaintiff with malice or reckless indifference to Plaintiff's state protected rights to oppose
practices that are prohibited by NYCAC.

821.   As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has incurred
damages including but not limited to lost wages, humiliation, loss of enjoyment of life,
emotional distress, physical injury, damage to their professional reputation, and other
pecuniary and non-pecuniary losses.

822.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

823.   Defendants discriminated against Plaintiff in the terms, conditions, or privileges of
employment based on gender and gender identity by denying them work opportunities afforded
to other, gender-conforming employees and allowing a hostile work environment because of
their gender.

824.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred
damages including but not limited to lost wages, humiliation, loss of enjoyment of life,
emotional distress, physical injury, damage to their professional reputation, and other pecuniary
and non-pecuniary losses, which damages would not have occurred but for Defendants'
discrimination.

**COUNT 20**
**NYCAC §8-101(a) et seq.**
**Discrimination Because of Disability**
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

825.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein. After
Plaintiff's trans non-conforming gender was disclosed, Defendants instituted a campaign of
harassment and discrimination on the basis of Plaintiff's non-conforming gender identity, i.e.,
their gender dysphoria.

826.   Defendants subjected Plaintiff to a hostile work environment because of their disabilities,
including gender dysphoria and physical limitations due to gender-confirming surgery, in
violation of NYCAC §8-101(a).

827.   The discrimination experienced by the Plaintiff was because of their disability or
Defendants' perception of them as disabled.

828.   Defendants did not undertake prompt or effective efforts sufficient to stop the hostile
environment.

829.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred
damages including but not limited to lost wages, humiliation, loss of enjoyment of life,

emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' unlawful hostile work environment.

## COUNT 21
### NYCAC 8-101(a) *et seq.*
### Refusal to Reasonably Accommodate
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

830.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

831.   Defendants refused Plaintiff's requests for reasonable accommodation in violation of the NYCAC 8-101(a).

832.   As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendants' discrimination.

## COUNT 22
### NYCAC §8-107, et seq.
### Retaliation because of Disability
**(Against Defendants Kingsborough, CUNY, Russell, Ferretti, Driscoll, Capozzi and Chung)**

833.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

834.   Plaintiff engaged in protected activity by protesting their disparate treatment by the Defendants.

835.   Plaintiff engaged in protected activity by protesting the Defendant's refusal to accommodate them.

836.   Defendants retaliated against Plaintiff because of their protected activity all in violation of the NYCAC §8-107.

837.   By filing complaint with the City of New York Commission on Human Rights, Plaintiff engaged in activities protected by NYCAC.

838. Plaintiff's exercise of protected rights was known to Defendants.

839. Following and because of Plaintiff's NYCAC protected conduct, Plaintiff was harassed, subjected to a hostile work environment and threatened with and subjected to tangible or adverse employment actions.

840. The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

841. By engaging in the conduct described above, Defendants intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by NYCAC.

842. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, physical injury, damage to their professional reputation, and other pecuniary and non-pecuniary losses.

## MANDATORY RECOVERY OF ATTORNEY FEES AND COSTS

843. Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

844. Plaintiff is mandatorily entitled to recover their attorneys' fees and costs pursuant to provisions of Title VII, NYHRL §297(10), NYCAC §8-502(g).

845. Plaintiff is entitled to an award of attorney fees pursuant to the Equal Access to Justice Act, codified at 5 U.S.C. § 504, *et seq*., 28 U.S.C. § 2412 *et seq*., and 28 U.S.C. § 2412 *et seq*.

## JURY DEMAND

846. Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, the New York State Human Rights Law, the New York City Administrative Code, the Americans with Disabilities Act, the United States Constitution and the New York State Constitution;

B.  Permanently enjoin Defendants Kingsborough and CUNY, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees who are transgender or gender non-conforming;

C.  Order Defendants Kingsborough and CUNY to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are transgender or gender non-conforming, and which eradicate the effects of Defendants' past and present unlawful employment practices;

D.  Order other affirmative relief necessary to eradicate the effects of Defendant's unlawful employment practices, including restoration of resources to WGS and restoration of rights to students who were targeted as a result of these practices;

E.  Order Defendants Kingsborough and CUNY to provide Plaintiff with a transfer to another CUNY WGS, retaining their tenure and rank.

F.  Direct Defendants to pay for past and future compensatory pecuniary and non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

G.  Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law; and

H.  Award such additional relief as justice may require.

Dated: January 24, 2020

Respectfully submitted,

s/Jillian T. Weiss

Jillian T. Weiss, Esq. (TW 4542)
Law Office of Jillian T. Weiss, P.C.
527 Hudson Street
P.O. Box 20169
New York, New York 10014
(845) 709-3237
Fax (845) 684-0160
jweiss@jtweisslaw.com
*Attorney for the Plaintiff*